Opinion issued December 31, 2024



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-23-00224-CV

———————————

**FRANK C. POWELL, Appellant**

**V.**

**COMMISSION FOR LAWYER DISCIPLINE, Appellee**

On Appeal from the 270th District Court
Harris County, Texas
Trial Court Case No. 2021-56827

## O P I N I O N

In this attorney discipline case, appellant Frank C. Powell appeals the trial court's judgment of disbarment. A jury found that Powell engaged in myriad professional misconduct, including by disregarding the client's decisions about the objectives and general methods of representation, using the client's confidential

information to her disadvantage after the representation, and taking positions that unreasonably increased the costs or other burdens of litigation.

After the jury rendered its verdict, the trial court held a separate sanctions hearing. It then entered a final judgment disbarring Powell. Following unsuccessful post-judgment motions, Powell appealed. We affirm.

## Background

Appellee Texas Commission for Lawyer Discipline ("Commission") sued Powell based on his representation in a family law matter. Accordingly, we begin by summarizing Powell's role in the underlying family law proceedings, then move to these disciplinary proceedings.

## I.    *The Underlying Custody Case*

The disciplinary action arose from a custody dispute between Catherine Molloy and Kevin Fletcher. Catherine and Kevin had two children, twins born in late 2011. One twin has significant medical needs, rendering her quadriplegic and in need of around-the-clock nursing care. The children's paternal grandparents, Dr. Stephen and Juliana Fletcher (collectively, "the Fletchers"), are involved in the children's lives. Dr. Fletcher, a pediatric surgeon, has in particular contributed to the care of the child with significant medical needs, including through financial support and payment for the child's health insurance.

By 2018, Catherine had stopped living with Kevin. Although they were not married, Kevin sued seeking divorce and custody of the children. The Fletchers intervened and became parties to the Custody Case.

A. ***Trial Court Proceedings in the Underlying Custody Case***

Although Catherine would later become his client, Powell was not initially involved in the Custody Case. When the Custody Case began in 2018 until at least March 2019, Catherine was represented by other lawyers. And during that time, the parties had nearly resolved the Custody Case. They participated in a mediation that resulted in a binding settlement agreement, and the Custody Case was nearly over. Then Powell got involved.

To understand Powell's role, we give some background about how settlement of Texas family law cases works. The Texas Family Code establishes procedures under which divorce and custody cases can be resolved through alternative forms of dispute resolution. *See* TEX. FAM. CODE §§ 6.602 (ADR in suits for the dissolution of a marriage), 153.0071 (ADR in suits affecting the parent-child relationship, or "SAPCR" cases). Under these procedures, family law cases can be mediated and, if a settlement is reached and certain conditions are satisfied, the resulting settlement agreement can be made binding and irrevocable. *See id*. § 153.0071(d) ("A mediated settlement agreement is binding on the parties if the agreement: (1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or

3

underlined, that the agreement is not subject to revocation; (2) is signed by each party to the agreement; and (3) is signed by the party's attorney, if any, who is present at the time the agreement is signed.").

After the parties have executed a binding settlement agreement, any party may generally have it entered as a judgment of the trial court. *See id.* § 153.0071(e) ("If a mediated settlement agreement meets the requirements of Subsection (d), a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law."). But in some cases, the Family Code allows the trial court to decline to enter the agreement as a judgment. One such circumstance is when the court finds that a party to the agreement was a victim of family violence that impaired that party's ability to make decisions. *See id*. § 153.0071(e-1)(1)(A).

In practice, the way this procedure often works is that once the parties reach a settlement agreement in mediation, their attorneys exchange drafts of a proposed order memorializing the terms of the agreement before presenting it to the trial court for entry as a judgment. The idea is that the judgment is intended to capture the terms of the mediated settlement agreement; it is not intended to deviate from the terms agreed to by the parties. And if a dispute arises over the language of the proposed judgment, the settlement agreement generally allows for the dispute to be resolved by an arbitrator, who is often the same person who served as the mediator. Once the

arbitrator has resolved any such "drafting disputes," the parties present the proposed judgment to the trial court.

Before Powell's involvement, the Custody Case followed this pattern. In March 2019, the parties—Catherine, Kevin, and the Fletchers—participated in a mediation that resulted in a binding and irrevocable settlement agreement. Catherine, herself a licensed Texas attorney, was represented by counsel at the mediation. The agreement addressed issues typical of custody disputes, such as possession, support, and parental decision making. It also established that: (1) Catherine and Kevin were not married; (2) Catherine, Kevin, and Dr. Stephen Fletcher, the children's paternal grandfather, would be joint managing conservators of the children; and (3) Dr. Fletcher had standing to participate in the Custody Case. Finally, the agreement provided for any drafting disputes to be resolved in arbitration, with the mediator serving as the arbitrator.

The agreement, entitled "Binding Mediated Settlement Agreement" ("MSA"), states in underlined and boldfaced type that "**EACH PARTY UNDERSTANDS AND AGREES THAT THIS AGREEMENT IS NOT SUBJECT TO REVOCATION AND THAT EACH INTENDS AND AGREES THAT EITHER PARTY IS ENTITLED TO JUDGMENT ON THE MEDIATED SETTLEMENT AGREEMENT . . . .**" All parties and their counsel signed the MSA. So it appeared the MSA would end the Custody Case.

5

But Powell's entry into the case derailed any closure. Powell did not represent Catherine in the mediation. But a few months after the parties had signed the MSA and the case appeared to be nearing its end, the mediator contacted counsel for the Fletchers and told him that Powell, now representing Catherine, had raised a drafting dispute and invoked the MSA's arbitration provision. At that point, counsel for the Fletchers was unaware of who Powell was, or even that there were any drafting disputes. The Fletchers' counsel contacted Powell to narrow or resolve any drafting disputes but was unsuccessful.

The parties participated in an arbitration in June 2019. For the other lawyers involved in the case, the arbitration would be their first time meeting Powell. Powell had already arrived at the arbitrator's office. When they entered the conference room where the arbitration would take place, and before any introductions were made, Powell told them, "[t]he first thing you guys need to understand is I'm a different kind of animal than anything you've ever dealt with before." The Fletchers' counsel testified that Powell called him a profane name and said he "went to law school to rid the world of lawyers like [the Fletchers' counsel]," and then continued by saying he was representing Catherine for free, that they would "rue the day" they declined to renegotiate the terms of the MSA, and that he would make "as much hell" for Kevin and the Fletchers as he could. Powell agrees he "said something along those lines" but contends those are not "direct quotes."

6

The Fletchers' counsel understood Powell's comments to mean Powell was "not there to discuss drafting disputes." Instead, he understood them to mean Powell wanted to "renegotiate the [MSA] that his client had agreed was not revocable" and "was threatening to . . . initiate litigation and cause financial harm to [the Fletchers] . . . for not capitulating to his demands." Ultimately, the parties did not renegotiate the substantive terms of the MSA, and the arbitrator issued an order.

After the arbitration, Powell began filing motions and issuing subpoenas to attack the MSA. Between June 2019 and August 2019, Powell signed and filed about 40 such instruments (he would later file dozens more), including subpoenas for all of the children's health care and educational records. Powell claimed these filings were warranted because counsel for Kevin and the Fletchers were filing "false pleadings to prevent [Catherine] from seeing her children," and his goal was to "unwind the MSA for lack of [Dr. Fletcher's] standing" to ensure Catherine had access to her children. But despite this claimed objective, none of Powell's filings sought to change Catherine's visitation rights under the MSA.

For example, the day after the arbitration, Powell filed, on Catherine's behalf, four motions in the Custody Case: (1) a "motion for evidentiary hearing" on the Fletchers' "false pleadings"; (2) a motion for sanctions and attorneys' fees; (3) a motion to set aside the MSA and for a new trial of the Custody Case; and (4) a motion for an evidentiary hearing to set aside the MSA. About two weeks later, Powell filed

7

a plea to the jurisdiction challenging the Fletchers' right to intervene, based on an alleged lack of standing.

Powell challenged the legitimacy of the MSA that all parties, including Catherine, had agreed to while represented by counsel, and which was intended to end the Custody Case. The motion for evidentiary hearing accused the Fletchers of filing deliberately false pleadings, and the plea to the jurisdiction challenged Dr. Fletcher's standing to appear in the Custody Case, despite that (a) Catherine had specifically agreed he had standing in the MSA; and (b) Powell later testified the arbitration "ended with no issues on standing." And the motion to set aside the MSA was based on a claim that Kevin "has a significant history of family violence, including both physical and emotional abuse of [Catherine]," despite Catherine's earlier sworn interrogatory response saying she "makes no such allegation" that Kevin had "committed an act of family violence." *Cf*. TEX. FAM. CODE § 153.0071(e-1)(1)(A).

In August 2019, the trial court held a hearing on whether to enter the MSA as a judgment, during which it also took up Powell's motions and plea. By that point, Powell had filed many motions and subpoenaed multiple witnesses to appear at the hearing. But he did not offer any evidence or call any witnesses at the hearing. The court denied all the motions as well as the plea. It also entered an order containing

8

substantially the same provisions as the MSA ("SAPCR Order"), including a specific finding that Dr. Fletcher had standing.

The court later entered findings of fact and conclusions of law in support of its SAPCR Order. On the family violence objection that Powell raised on Catherine's behalf, the district court specifically found that Catherine:

> did not lodge any objection to the arbitration and . . . had not plead or disclosed through discovery, any allegation of family violence prior to the commencement of the arbitration that was convened at her request. . . . No family violence objection or evidence of any kind was presented to the Court. . . . The first mention of family violence was in pleadings filed by [Catherine] after the June 3, 2019 arbitration. The Court finds that the assertions of family violence in the pleadings filed by [Catherine] after the June 3, 2019 [sic] are vague, unsubstantiated, unverified, and conclusory statements that are not supported by the facts. . . . The Court further finds that the allegation of family violence contradicts [Catherine's] sworn interrogatory response to a question about family violence and the Court therefore finds that the allegation of family violence constitutes a "sham" on the Court, asserted for the sole purpose of attempting to set aside an otherwise valid [settlement agreement.]

A few months later, Powell filed a request for the trial court to comply with "Canon 3(D)(2) of the Texas Code of Judicial Conduct." In it, he claimed the Fletchers' counsel filed "knowingly false pleadings" about the Fletchers' standing, even though the parties had already agreed, and the trial court had already found, that the Fletchers had standing. Powell later supplemented that request, doubling down on his standing arguments and claiming the Fletchers' counsel made material

9

omissions in opposing Powell's bill of exceptions. Powell characterized these alleged omissions as a "fraud on the court," and he asked the district court to "comply with its duties as outlined in the Texas Code of Judicial Conduct" by reporting the Fletchers' counsel to the State Bar of Texas.

In early 2020, Powell moved to recuse the trial judge. Powell filed the recusal motion after the trial judge mistakenly signed a discovery order but did not recognize the error until after its entry, and then voided the order. After the district clerk's office spoke with the trial judge about the voided order, it was removed from the clerk's file and website, in line with the clerk's standard procedures for voided orders. Powell's recusal motion alleged that this sequence of events meant the judge had engaged in criminal behavior because it "implicated [her] in actions that made a government document unavailable," making her "a witness to how this signed court order became unavailable" and allowing for her "impartiality [to] be reasonably questioned." Powell made these allegations despite being told by the clerk's office that the voided order remained available and could be obtained by filing a motion.

The recusal motion was referred to the Presiding Judge of the Eleventh Administrative Judicial Region of Texas. Powell then moved to recuse the Presiding Judge from participating in the recusal proceedings for the Custody Case. That motion was denied, and Powell was ordered to pay $5,500 in attorneys' fees.

With the recusal motion now back before the Presiding Judge, she held a hearing. At its conclusion, the Presiding Judge denied Powell's motion to recuse the Custody Case judge and sanctioned Powell and Catherine $19,000 for bringing the motion in bad faith. The Presiding Judge remarked at the hearing, "I believe, as I have never in a recusal hearing believed, that someone brought [the motion] in bad faith."

After the Presiding Judge denied the recusal motion and imposed sanctions, Powell sent a letter to the Clerk of Court, making claims like those he had made in the recusal motion. Among other claims, Powell's letter alleged the Custody Case judge had engaged in criminal conduct based on her involvement in "removing" the void order from the Clerk's file. He asked the Clerk to investigate, including whether "there really was a 'voided' order originally or not," and then to "refer these matters to the District Attorney for criminal proceedings as appropriate, refer the matter to the Texas Judiciary to the extent it is determined that Judge Peake is involved in the ruse, and terminate all county employees that were involved in this ruse." Powell closed his letter by threatening that if he did not receive a response within nine days, he would "take whatever steps I deem necessary, including but not limited to, seeking a Chapter 52 Court of Inquiry under the Texas Code of Criminal Procedure."

**B.** *Appellate Proceedings Relating to the Underlying Custody Dispute*

Powell challenged the district court's rulings in the Custody Case in a series of appeals and original actions filed in this Court. In late 2019 and early 2020, he filed: (1) a mandamus proceeding challenging the district court's denial of his plea to the jurisdiction; (2) a direct appeal of the SAPCR Order; (3) a mandamus proceeding challenging the trial court's rulings on bills of exceptions Powell had filed; and (4) a direct appeal of the denial of his motion to recuse.

This Court ruled against Powell in each of these proceedings. We denied Powell's petition for writ of mandamus challenging the trial court's ruling on his plea to the jurisdiction. *See In re Molloy*, No. 01-19-00621-CV, 2020 WL 4589760, at *1 (Tex. App.—Houston [1st Dist.] Aug. 11, 2020, orig. proceeding) (mem. op.). We dismissed as moot the appeal of the SAPCR Order. S*ee Molloy v. Fletcher*, No. 01-19-00840-CV, 2021 WL 1618466, at *1 (Tex. App.—Houston [1st Dist.] Apr. 27, 2021, no pet.) (mem. op.). We also dismissed Powell's mandamus petition on the bills of exception. *See In re Molloy*, No. 01-19-00894-CV, 2021 WL 1618469, at *1–2 (Tex. App.—Houston [1st Dist.] Apr. 27, 2021, orig. proceeding) (mem. op.). And we affirmed the district court's imposition of sanctions against Powell for filing the bad-faith recusal motion, noting "[w]e agree" that "Powell's conduct was egregious, and this appeal was brought in bad faith, and intended to delay and harass

the appellees." *Powell v. Fletcher*, 695 S.W.3d 675, 682 (Tex. App.—Houston [1st Dist.] 2024, pet. denied).

### C.      *Powell's Relationship with Catherine*

The relationship between Powell and Catherine mixed business and personal matters. Although Powell represented Catherine in the Custody Case post-MSA, he never memorialized the terms or scope of his representation in an engagement letter or other form of written agreement, and Catherine never paid Powell for his work. And throughout most of the events described in this opinion, Powell was not only Catherine's attorney but also her boss and landlord. Powell employed Catherine to work as an attorney at his law firm, and he provided her with a rent-free place to live, giving Powell a significant degree of control over her life.

Because she was working as an attorney at Powell's law firm, Catherine also represented the firm's other clients. One such client was Powell's wife. Another was Catherine's brother, Jason Molloy, whom Powell's firm represented on a pro bono basis in two criminal matters. Catherine also represented Powell himself.

Powell also had an intimate relationship with Catherine. Although Powell's brief describes it as an "alleged . . . romantic relationship," both he and Catherine testified they were sexual partners. Powell gave conflicting testimony about the timing and duration of this relationship. During the trial of this disciplinary case, Powell testified that his sexual relationship with Catherine lasted "[a] week or two"

13

and took place "[b]efore she finished law school." But in other hearings arising out of the Custody Case, Powell testified he was in a sexual relationship with Catherine when he began representing her (by which point she was working for his firm as a licensed attorney) and that it lasted multiple months. Powell ultimately admitted he engaged in a sexual relationship with Catherine "at the time [he] took this case over in May or June of 2019." Catherine testified that this sexual relationship with Powell was not "something [she] particularly wanted to be involved in" but believed it "was something that became expected of [her]," and Powell was "unhappy" about her "efforts to end it."

## D. *Powell's Continuing Authority to Represent Catherine*

As the appellate cases were moving forward in late 2019 and early 2020, questions arose about Powell's authority to continue representing Catherine. Catherine apparently approved of the first mandamus filing, challenging the district court's ruling on the plea to the jurisdiction. But Catherine testified she did not recall authorizing the other appeals, and "[i]f I did, it was due to the fact that my employment and my residence was contingent on cooperating with the demands of Mr. Powell."

Catherine also testified that after the first mandamus filing, she began telling Powell, orally and in writing, that she no longer wanted him to represent her. Beginning in late 2019 or early 2020, she told Powell "multiple times" in "text

14

messages, verbal conversations, and possibly e-mails" that she wanted to end the litigation. For example, before Powell filed the motion to recuse in early 2020, Catherine asked him to "nonsuit the entire—the appeals, the whole thing."

Powell did not follow these requests. According to Catherine, Powell's response was generally to "raise his voice and shout obscenities at [her] and pretty much disregard [her] request," which caused Catherine to be "afraid of being evicted, . . . afraid of being fired, and . . . afraid of the methods he would take to retaliate against [her]." Catherine testified that Powell "made it very difficult and unpleasant for me to voice my desire to nonsuit the entire appeals and everything else," and that he "repeatedly and specifically threatened to evict me and fire me any time I expressed my desire to drop this matter." Several times Powell told Catherine that "she would never work in this town again and he's going to see to it."

The record contains text messages between Catherine and Powell that track Catherine's testimony. For example, one undated text exchange (which appears to have taken place around this time and Powell agreed was sent before May 2020) begins with Powell telling Catherine, "I hope you someday get your shot [sic] together but I have zero belief that you ever will." Catherine responded, "Thank you / should I prepare a letter memorializing our earlier conversation? Non-suits? I'm really not sure / I am very grateful for all of your help," to which Powell replied, "Can't non suit something that is not a suit. You can fire me. Then you can hire

someone to dismiss appeals. I will not do it. You'll have to allow me to withdraw and have someone else file notice of appearance and do whatever it is you want."

When Catherine wrote back that "I can't hire anyone . . . I can send you a letter / And attempt to dismiss by myself," Powell responded, "Then you have a problem. . . . I am not dismissing anything. You'll ha e [sic] to fire me and then hire someone else to do it. Then, I hope you never see your kids because you swerve [sic] that since you are getting played by them. That is what you deserve for you f'n nonstop games." Catherine next asked, "Okay. Just send you a letter memorializing our earlier conversation?" which Powell answered by saying, "No, it is much more involved than that. Hire [opposing counsel] to help. Maybe you can lie to him the way you lie to me."

In another text exchange, Catherine wrote to Powell and asked, "Can we talk when you have a few minutes, please? I want to stop trying to appeal the [MSA]. I am even willing to let them take a judgment against me for sanctions. I don't want to fight anymore. I have given it a lot of thought and am ready to drop it." Powell did not dismiss the appeal of the SAPCR Order after receiving this text.

On April 27, 2020, after Catherine's repeated requests to end the litigation went unheeded, Catherine sent two emails to her adversaries in the Custody Case, one directly to Kevin and the Fletchers, and the other to their counsel. The email to Kevin and the Fletchers said, "I have communicated this to my lawyer several times

16

now, to no avail. He refuses to drop the appeal and has informed me that I have to hire someone else in order to do so. I should, but I don't know how to make it stop. I am trying to figure it out how, but want to speak up and say something today, before I allow any more time to pass, because I feel that time is of the essence." Catherine's email to opposing counsel said, "I am writing to tell you that I unequivocally no longer wish to engage in any sort of litigation with Kevin Fletcher, or his parents, Dr. or Mrs. Fletcher. I have communicated this to my lawyer several times and he has told me that he refuses to dismiss the appeals. My last attempt to do so was in February, I believe, to no avail. . . . I am sorry for my part in this and hope to make the litigation stop as soon as possible."

Upon receiving Catherine's email, Kevin's counsel wrote to Powell and demanded he show authority to represent Catherine. Powell responded in a letter three days later, writing, "I can assure you that I have the authority to represent Catherine Molloy in these cases. I simply will not acquiesce to your demands." Powell included with his letter an affidavit signed by Catherine and dated April 27, 2020, in which Catherine stated that Powell represented her in the custody dispute and another district court case, as well as in the four appellate proceedings described above. Catherine added in the affidavit that "Powell currently represents me and has my full authorization to prosecute the above cases until completion. This includes appeals to higher courts, if needed. . . . Powell represents me and has my authority

to do so despite any communications that I may have sent to third parties indicating otherwise."

Counsel for the Fletchers testified that Catherine's affidavit "leaves you scratching your head, wondering what is going on because [it was] contrary to the email [he had received from Catherine a few days earlier]; but this is what Mr. Powell provided."

On May 12, 2020, less than two weeks after she signed the affidavit, Catherine emailed Kevin and wrote, "More bs got filed and it is not my fault. I'm going to formally fire him once I get paid Friday."

Two days after sending this email, Catherine sent a handwritten letter to the Fletchers (handwritten to "eliminate any questions as to its author or its authenticity") explaining the affidavit and reiterating her desire to end the litigation. She wrote:

> If I had the option of having my employer/attorney convey the contents of this letter to you, I would do that instead. . . .
>
> I reached out to you, Kevin and your attorneys recently following another unsuccessful attempt to ask my employer/attorney to end the pending litigation(s) between us. (I have sent Kevin copies of the correspondence memorializing this request and his corresponding refusal to non-suit.) Given this refusal, I wrote you all in an effort to convey my sincere desire to tell you how very sorry I am for all that has transpired, as well as the fact that I have no desire to fight/litigate any further.

. . . .

When the message(s) I sent you all came to the attention of my employer/attorney, I was promptly informed that I no longer had a job or a home. I was subsequently informed that I could keep both on the condition that I signed an affidavit essentially contradicting my statements to you. I am ashamed to admit this, but I complied due to my fear of being homeless and unemployed. . . . Accordingly, I did as I was told and signed the affidavit because I feared unemployment, homelessness, and possibly going to jail, not because I was trying to be dishonest or deceptive.

I don't want to fight with you, Kevin or anyone else and haven't for some time now. This has gone on far too long and I want it to stop. . . .

. . . .

Candidly, I have gotten myself into a bad situation. As I mentioned, my home and my job are contingent upon my cooperation with someone whom I have discovered is a very angry, damaged individual. My employer/attorney doesn't care about me, my family, or my best interests. He has his own agenda and insists on pursuing I, despite my requests to the contrary.

I never wanted him to appeal the [MSA]. I never signed an engagement letter/employment agreement for him to act as my attorney and have had very little say in the events that have transpired subsequently. Excuse me for being repetitive, but I have made several requests to put a stop to this litigation. Prior to contacting you, he refused and told me to hire someone to do it. I ran out of money to spend on legal fees some time ago, and can't afford to hire someone to put a stop to this. I should probably know how to do it myself but honestly, I don't. I don't know appellate law or even if I am permitted to represent myself (in order to make the litigation cease in the Court of Appeals).

The Fletchers sent Catherine's letter to their counsel. At the time, the appeal of the SAPCR Order was pending in this Court. The Fletchers' counsel filed a motion asking us to remand the case to the trial court for an evidentiary hearing on Powell's authority to represent Catherine, with a copy of Catherine's letter attached as an exhibit.

When Powell received his service copy of the motion, he immediately called Catherine, fired her, and kicked her out of the house where she was living. Powell claims he did not end her employment on that date, but only told her "I wanted her to get all of her stuff out of the office." Catherine understood the conversation to mean that Powell had fired her, and she texted Kevin that "I am just in big trouble for writing y'all . . . . I am fired and trying to get my stuff out of here." That conversation was the last time Powell and Catherine spoke.

Powell responded to motion to show authority, arguing that he had authority to represent Catherine. He also argued: (1) Kevin and the Fletchers were "attempting to exercise control over [Catherine] to prevent this Court from issuing opinions in her cases"; (2) opposing counsel were engaging in a "lack of candor to the tribunal," "perpetuating more of the same nonsense," and "perpetuat[ing] more fraud on this Court" by making arguments "they know are absolutely false"; (3) the Fletchers lacked standing; and (4) the trial judge "necessarily had to be involved in something

20

improper or inappropriate" and possibly "culpable for criminal acts," another reference to the voided order.

Powell supported his response with two affidavits from Catherine's brother, Jason Molloy. Jason was then being represented by Powell's law firm, for free, in two criminal proceedings. Powell requested these affidavits from Jason, and Catherine testified she believed Jason "was pressured" to sign them because "if he did not sign these, [Powell's firm] would no longer represent him in connection with his criminal—pending criminal charges."

Jason's affidavits support the arguments Powell made in his response. They make claims about the Fletchers' lack of standing, they state that Catherine's May 14, 2020 letter to the Fletchers contains "many factually false claims and/or accusations," and they discuss confidential matters such as Catherine's health care treatments, hospitalizations, and "the issues that have plagued her for most of her adult life." Powell did not consult with Catherine before he requested these affidavits from Jason.

Powell's response to the motion to show authority also asked this Court to order the trial court to appoint a guardian ad litem over Catherine. Powell wrote that because he "holds a Doctor of Medicine degree," he "is uniquely qualified to assess [Catherine's] competency to fully understand the consequence of her actions at this stage of the proceedings." Although he had never acted as Catherine's doctor or

21

given her medical advice, Powell argued that based on "lengthy discussions" with her "over twelve to thirteen months," he concluded that Catherine "has not demonstrated the necessary understanding to make the decision to dismiss her appellate level cases." Powell also cited Jason's affidavits in support of his request for the appointment of an ad litem, in which Jason stated, "I also believe that Catherine is not capable of making sound decisions in her present state of mind and under the present situation as it relates to her litigation in the cases regarding the custody of her children. . . . Catherine does not fully understand the consequences of her actions and I believe she needs someone appointed to look out for her interests." Powell did not consult with Catherine before he asked for a guardian ad litem.

Powell's response to the motion to show authority thus: (1) requested the appointment of a guardian for his client, who until that time, he had employed as a lawyer representing him and his wife in other matters, as well as other firm clients; (2) did so at a time when Catherine was seeking both employment and the custody of her children; (3) relied on affidavits solicited from one firm client to make negative statements about another firm client; and (4) disclosed confidential information about the status of Catherine's health and health care without her consent.

We granted the Fletchers' motion, abated all of Catherine's then-pending appeals, and remanded the case to the trial court to hold a hearing. *Powell*, 695 S.W.3d at 678–79. After we entered the abatement and remand order, Catherine retained another attorney, C. Hale, to represent her in her efforts to terminate Powell and resolve any remaining issues in her cases.

Hale sent two letters to Powell requesting a copy of Catherine's file, the first on July 24, 2020, and the second on August 4, 2020. Although Powell sent one box of documents in response, he did not provide Hale with Catherine's complete file, and he did not provide emails, texts, or other correspondence between him and Catherine. Powell claimed he could not provide these materials because he needed time to review and redact them for any privileged content that may have been included through Catherine's work for other firm clients. Powell had not produced these materials by the time the district court conducted the hearing on his authority to represent Catherine.

On remand, the district court conducted a five-day evidentiary hearing on the motion to show authority. It found that Powell and his firm had not had authority to represent Catherine since September 21, 2019; that Catherine had "clearly and unequivocally" communicated to them her desire to dismiss her four pending cases; and that they disregarded those instructions.

The district court also found that Powell or his firm:

23

- "was able to manipulate Catherine due to the imbalance of power that existed by virtue of . . . Powell being [her] landlord, employer, attorney and sexual partner";

- "used threats, intimidation, and the disparity of power between the two to force [Catherine] to falsely assert that . . . Powell [and his firm] indeed had authority when he did not";

- took actions and filed documents "for the sole purpose[] of harassment," "motivated by personal animosity toward opposing counsel and the opposing parties," and "in bad faith";

- repeatedly made "false accusations against opposing counsel, opposing parties, and [the district court judge] as part of [a] pattern of threatening behavior," including "'sham' allegations of family violence against Kevin";

- failed to provide Catherine's file to Hale in "bad faith";

- made a "baseless" motion for the appointment of a guardian ad litem for Catherine that was part of a "pattern of vindictive behavior" and "clearly calculated to embarrass [Catherine], make her search for employment more difficult[,] and harm her custody litigation";

- filed mandamus proceedings for an "improper purpose"; and

- "committed numerous acts of sanctionable conduct."

The district court recommended sanctioning Powell and his firm $491,582.72, and we affirmed. *Id.* at 682.

Catherine testified on two of the five days for the motion-to-show-authority hearing. She died by suicide on August 27, 2020, before the hearing was concluded.

24

## II. *Related Proceedings*

In May 2022, while the Custody Case was pending and after these disciplinary proceedings began, Powell filed a separate lawsuit against most of the people involved in the Custody Case. *Powell v. Lindamood et al.*, No. 2022-29832, Harris County District Court, 133rd Judicial District ("133rd Case"). He sued 13 defendants, including: the Fletchers; their lawyers at both the trial and appellate levels (*i.e.*, the same lawyers whom Powell told, from the start of his involvement in the Custody Case, that they would "rue the day" they failed to renegotiate the terms of the MSA, that he would cause their clients financial harm, and that he would "make as much hell" for them as possible); Hale and her firm (*i.e.*, the lawyer who began representing Catherine after Powell refused to follow her instructions); and the trial judge who presided over the Custody Case.

Powell alleged that each of these defendants had engaged in various forms of wrongdoing in the Custody Case. He made claims for civil conspiracy, fraud, and gross negligence and sought compensatory and exemplary damages. Powell also alleged that Catherine's death by suicide was the "result of Hale's actions" in representing her in the Custody Case, and that Catherine's depression and other medical conditions were "mostly secondary to Defendants' attempts to manipulate her."

Powell's 133rd Case was assigned to visiting judge Martha Hill Jamison. After five days of hearings, Judge Jamison dismissed the 133rd Case, awarded attorneys' fees to the defendants, and sanctioned Powell.

As the hearings before Judge Jamison progressed, "Powell retained [investigative firm] Dolcefino Consulting to attend [one of the hearings]. Wayne Dolcefino [and his camera crew] sat in the courtroom during the hearing and followed several of the Defendants to the courthouse elevator during the lunch break, putting a microphone to their faces and asking questions with raised voices." Powell claimed that he hired Dolcefino to investigate the Custody Case judge, but given that the Custody Case judge was never served and not present, Judge Jamison found that Dolcefino "was there only to harass the Defendants and perhaps to intimidate the undersigned."

In extensive findings of fact and conclusions of law, Judge Jamison also found:

- Powell's filing of a "flurry" of motions in Catherine's Custody Case "indicates a primary motive of harassment and needless increase in Defendants' litigation expense."

- The 133rd Case is "a troubling case. It is somewhat unclear whether Powell and [his attorney] are ineffectual as attorneys or just angry that [the Custody Case judge] ruled against them and allegedly treated them poorly in court. At any rate, they had no legal basis for filing the [133rd Case]."

- "No attorney who did the bare minimum of research could have believed their claims had any legal merit . . . . Instead, however,

26

[Powell] doubled down by suing more parties, including the [the Custody Case judge] herself."

- "The evidence demonstrated that [Powell] used the Texas courts as a playground for revenge. There is no other explanation for a flurry of mandamus and recusal motions against judges who ruled against them in [the Custody Case], including the Presiding Judge of the 11th Administrative Judicial Region of Texas who denied a recusal motion against the trial judge."

- "The evidence established that [Powell] filed the [133rd] Case to punish those who dared crossed them in the [Custody Case]. . . . I conclude the [133rd] Case was brought for harassment. . . . It was part of a continuous strategy to reverse the rulings in the [Custody Case] or punish the [opposing parties] for prevailing."

- The Custody Case "was settled in 2019, prior to the pandemic. Everything that has occurred thereafter . . . was triggered by Powell's misconduct."

- Powell and his firm have "thrown out the Texas Disciplinary Rules of Professional [Conduct], civility, and good sense. Sanctions are directly related to their abuse of the Texas court system and the Defendants and must be assessed to deter future conduct."

Judge Jamison ordered Powell to pay $1.76 million in sanctions ($760,000 to the opposing parties, and $1 million to the Texas Access to Justice Foundation). The sanctions assessed by Judge Jamison are on top of the over half a million dollars in sanctions assessed against Powell in the Custody Case and the nearly $32,000 in fees Powell has been ordered to pay in these disciplinary proceedings.

### III.  *This Attorney Disciplinary Case*

The Commission's Office of Chief Disciplinary Counsel ("CDC") initiated disciplinary proceedings against Powell based on his involvement in the Custody Case.

### A.  *Pretrial Proceedings and Trial*

In October 2020, the CDC sent Powell written notice that a grievance had been filed against him, and that the grievance had been classified as a formal complaint. The CDC sent a notice that just cause existed to proceed with the complaint, in accordance with Texas Rule of Disciplinary Procedure 2.14. *See* TEX. RULES DISCIPLINARY P. R. 2.14, *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G, app. B. The CDC sent this notice by email to Powell's attorney, J. Ketterman. The notice included a form with which Powell could elect to have his disciplinary proceedings heard by an evidentiary panel of a grievance committee, or by a district court. *See* TEX. RULES DISCIPLINARY P. R. 2.15. Neither Powell nor Ketterman responded.

Having received no response to its earlier notice, the CDC resent the just cause notice and election form to Ketterman two months later. The CDC's cover email stated, "[a]ttached please find the *Just Cause Election Letter* on the Powell [SBOT] matter. This was sent to you on March 8, 2021; the Election Response is overdue. Can you please send Respondent's Election Response by COB tomorrow, May 6,

2021? If Respondent's Election Response is not received we will have to default Respondent into Evidentiary Hearing on Friday, May 7, 2021."

Ketterman responded by email the next day. She wrote, "[p]lease see the attached Election of Jury Trial by Frank Powell." The record does not contain a copy of the signed election form, only Ketterman's transmittal email stating that Powell had elected a "Jury Trial." But Powell does not dispute that he signed the election form indicating his choice to proceed by jury trial in a district court, and the record of a related mandamus proceeding before this Court *does* contain a copy of the election form, signed by Powell.[1] Accordingly, we take judicial notice of Powell's signed election form. *See Reynolds v. Quantlab Trading Partners US, LP*, 608 S.W.3d 549, 557 n.3 (Tex. App.—Houston [14th Dist.] 2020, no pet.) ("An appellate court may take judicial notice of its own records in the same or related proceedings involving the same or nearly the same parties." (citing *In re Chaumette*, 456 S.W.3d 299, 303 n.2 (Tex. App.—Houston [1st Dist.] 2014, orig. proceeding)).

After receiving Powell's election form, the CDC forwarded its disciplinary petition to the Honorable Susan Brown, Presiding Judge of the Eleventh Administrative Judicial Region, for assignment. *See* TEX. RULES DISCIPLINARY P. R.

---

[1] Powell's signed copy of the election form is included in the record of *In re Frank C. Powell*, No. 01-23-00095-CV, 2023 WL 2697891, at *1 (Tex. App.—Houston [1st Dist.] Mar. 30, 2023, orig. proceeding) (mem. op.).

3.01. Judge Brown assigned Judge Terri Holder to preside over Powell's disciplinary proceedings. *See* TEX. RULES DISCIPLINARY P. R. 3.02.

The disciplinary case against Powell moved forward. Powell answered shortly after Judge Holder was assigned. The parties engaged in pretrial matters over the next 15 months, from September 2021 through December 2022, and the docket sheet shows that Powell actively participated throughout that period. For example, his attorney signed an agreed docket control order, the parties engaged in extensive discovery and motion practice, they signed a Rule 11 agreement, and Powell filed a notice of appearance in which he designated himself as co-counsel of record. At no point did Powell object to his disciplinary proceedings being conducted by a district court, nor did he claim the district court lacked jurisdiction.

Powell's case proceeded to a jury trial in December 2022. The jury trial took place over eight days and included testimony from nine witnesses, including Powell. When the jury returned its verdict, it found that Powell committed professional misconduct in six ways:

1. By failing to abide by Catherine's decisions concerning the objectives and general methods of representation, in violation of Texas Disciplinary Rule of Professional Conduct 1.02(a)(1);

2. By adversely limiting his representation of Catherine due to his own interests or those of his law firm, in violation of Texas Disciplinary Rule of Professional Conduct 1.06(b)(2);

3. By using Catherine's confidential information to her disadvantage after his representation of her ended, in violation of Texas Disciplinary Rule of Professional Conduct 1.05(b)(3);

4. By asserting or controverting an issue in Catherine's Custody Case in the absence of a reasonable belief that the basis for doing so was not frivolous, in violation of Texas Disciplinary Rule of Professional Conduct 3.01;

5. By taking a position that unreasonably increased the costs or other burdens of the case, or that unreasonably delayed resolution of the matter, in violation of Texas Disciplinary Rule of Professional Conduct 3.02; and

6. Upon termination of his representation of Catherine, by failing to take steps to the extent reasonably practicable to surrender papers and property to which she was entitled, in violation of Texas Disciplinary Rule of Professional Conduct 1.15(d).

The trial court held a separate evidentiary hearing on sanctions. The court signed the final judgment, disbarring Powell and awarding the State Bar of Texas $31,829.20 in attorneys' fees and expenses.

At the sanctions hearing, Powell testified that he does not believe he engaged in any misconduct in representing Catherine. When asked, "So you don't think you did anything wrong in your representation of [Catherine], correct?" Powell answered, "I follow my clients' wishes and directives at all times. She flip-flops. And the answer is no, I don't think I did."

Judge Holder retired, but she elected to continue to serve as a senior judge. On February 2, 2023, Regional Presiding Judge Brown entered an order appointing Judge Holder to continue presiding over Powell's disciplinary case.

31

**B.    *Post-Judgment Proceedings***

After the judgment of disbarment was entered against him, Powell tried to stay the judgment or have it overturned. In January 2023, Powell moved for new trial and to set aside the judgment. He argued for the first time that: (1) despite having elected to proceed in district court and participating in both pretrial proceedings and a jury trial without objection, the district court lacked subject matter jurisdiction to hear the case because his election to proceed before a district court was untimely; and (2) Judge Holder was disqualified from presiding over the disciplinary case on various procedural grounds. After a hearing, the trial court denied Powell's motion for new trial in a written order.

The next month, Powell petitioned this Court for writs of mandamus, injunction, and prohibition directing the district court to set aside its judgment of disbarment, as well as an emergency motion to stay the judgment. Powell's petition made similar arguments to those he made in his motion for new trial. Concluding that Powell had "not established his entitlement to relief," we denied the both the petition and the motion. *In re Frank C. Powell*, No. 01-23-00095-CV, 2023 WL 2697891, at *1 (Tex. App.—Houston [1st Dist.] Mar. 30, 2023) (mem. op.).

The next month, Powell's counsel wrote to the district clerk's office to request that it accept a supersedeas bond, and she deposited $500 in the court's registry for that purpose. Powell's counsel did not copy the Commission's counsel on this

request or inform the Commission's counsel that she had filed the bond. When the Commission nevertheless learned of the bond, it moved to cancel it based on Texas Rule of Disciplinary Procedure 3.13. *See* TEX. RULES DISCIPLINARY P. R. 3.13. Rule 3.13 states, "[a] district court judgment of disbarment . . . cannot be superseded or stayed." *Id.* The trial court granted the Commission's motion and canceled Powell's bond, leaving the judgment of disbarment in force.

In December 2023, Powell moved to disqualify Judge Holder and set aside the judgment of disbarment. He argued that Judge Holder had not been properly assigned to preside over his disciplinary proceedings, and that even if she had been she was constitutionally disqualified. Powell's disqualification arguments were based on contentions that he could not find public records showing Judge Holder took the oath of office after being re-elected, and that after retiring she did not sign the requisite anti-bribery statement until the day after being re-assigned to the case, not before. Powell's motion to disqualify was referred to Judge Brown, who denied it.

## Analysis

Powell appeals the trial court's judgment of disbarment and asks that we reinstate his Texas law license. He contends we should reverse the trial court's judgment because: (1) the district court lacked subject matter jurisdiction over his disciplinary proceedings; (2) Judge Holder lacked authority to issue the judgment;

(3) Judge Holder was "constitutionally disqualified" and should have recused herself; (4) the district court abused its discretion by admitting into evidence findings of fact and conclusions of law made in connection with the motion to show authority in the Custody Case; (5) the evidence was legally and factually insufficient to support the jury's verdict and the sanction of disbarment; and (6) the district court abused its discretion in ruling on Powell's bill of exceptions.[2]

## I.      The District Court Had Subject Matter Jurisdiction Over Powell's Disciplinary Case.

In his first issue, Powell contends the district court lacked subject matter jurisdiction over his disciplinary proceedings, and thus its judgment of disbarment is void. *See Engelman Irrigation Dist. v. Shields Bros*., 514 S.W.3d 746, 750 (Tex. 2017) ("A judgment rendered without subject-matter jurisdiction is void and subject

---

[2]      Attached to Powell's reply brief is a six-page, single-spaced typewritten letter, purportedly written and signed by Catherine on August 26, 2020, one day before she died by suicide. The letter generally purports to absolve Powell of any wrongdoing, stating that he "did not violate any ethics rules at all," and places blame for the events arising out of the Custody Case on most of those involved other than Powell, urging that "[h]opefully with this letter, the Fletchers, their attorneys, Hale, and the corrupt Judge Peake will all be prosecuted." Powell's reply brief urges us to consider this letter, saying it was "[u]nbeknownst to Powell until now," and that "[r]eading this final letter from [Catherine] should give a reasonable person pause about the proceedings, and hopefully force an independent and objective review of how Powell was railroaded throughout." We do not consider this letter because it is not a part of the record. *Democratic Schs. Research, Inc. v. Rock*, 608 S.W.3d 290, 305 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("Documents attached as exhibits or appendices to briefs do not constitute formal inclusion of such documents in the record on appeal, and we cannot consider matters outside the record in our review.").

to collateral attack."). But before turning to Powell's jurisdictional argument, an overview of attorney disciplinary proceedings will be useful.

## A. Attorney Disciplinary Proceedings in General.

The Texas Supreme Court has the inherent power to regulate the practice of law in the State of Texas for "the benefit and protection of the justice system and the people as a whole." *In re Nolo Press/Folk Law, Inc.*, 991 S.W.2d 768, 769 (Tex. 1999); *see also* TEX. CONST. art. II, § 1; *id*. art. V, §§ 1, 3; TEX. GOV'T CODE § 81.011(c); *In re State Bar of Tex.*, 113 S.W.3d 730, 732 (Tex. 2003). It also has constitutional and statutory responsibilities to maintain appropriate standards of professional conduct, including the responsibility to dispose of individual lawyer discipline cases. TEX. CONST. art. II, § 1; TEX. RULES DISCIPLINARY P. R., Preamble. And the Texas Legislature enacted the State Bar Act in aid of the Court's inherent power to regulate the practice of law in Texas. TEX. GOV'T CODE § 81.011(b) ("This chapter is in aid of the judicial department's powers under the constitution to regulate the practice of law, and not to the exclusion of those powers."); *see also In re Nolo Press/Folk Law*, 991 S.W.2d at 770 ("The Court's inherent power under Article II, Section I to regulate Texas law practice is assisted by statute, primarily the State Bar Act.").

The Texas Supreme Court has delegated responsibility for administering and supervising lawyer discipline and disability to the Board of Directors of the State

Bar of Texas. TEX. RULES DISCIPLINARY P. R., Preamble. The Board is vested with authority to adopt rules of procedure and administration consistent with the Texas Rules of Disciplinary Procedure. *Id.* The Commission is a permanent committee of the State Bar of Texas. TEX. GOV'T CODE § 81.076(b); TEX. RULES DISCIPLINARY P. R. 1.06(D). Each attorney admitted to practice in Texas is subject to the disciplinary and disability jurisdiction of the Supreme Court and the Commission. TEX. GOV'T CODE § 81.071.

Every Texas attorney is also subject to the Texas Disciplinary Rules of Professional Conduct (the substantive rules governing attorneys' professional conduct) and the Texas Rules of Disciplinary Procedure (the procedural rules governing the attorney disciplinary process). *Id.* § 81.072(d). These rules "have the same force and effect as statutes" and are interpreted using the usual rules of statutory construction. *See Comm'n for Law. Discipline v. Hanna*, 513 S.W.3d 175, 178 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (citing *Love v. State Bar of Tex.*, 982 S.W.2d 939, 942 (Tex. App.—Houston [1st Dist.] 1998, no pet.)).

Under these rules, a grievance against a lawyer starts as an administrative proceeding, and it may be classified either as an "inquiry" or a "complaint." TEX. RULES DISCIPLINARY P. R. 2.10. If the Commission determines that a grievance constitutes an inquiry, it is dismissed (subject to appeal). TEX. RULES DISCIPLINARY P. R. 2.10.A. But if the Commission determines that a grievance should be classified

as a complaint, it proceeds through the disciplinary process. TEX. RULES DISCIPLINARY P. R. 2.10.B.

For those grievances classified as complaints, the Commission's CDC investigates the complaint to determine whether just cause exists to proceed. TEX. RULES DISCIPLINARY P. R. 2.12. If just cause is lacking, the complaint is placed on a summary disposition docket, and a summary disposition panel determines whether it should be dismissed or proceed through a disciplinary proceeding or disciplinary action. TEX. RULES DISCIPLINARY P. R. 2.13. But if the CDC determines that just cause exists, the CDC "shall give the Respondent written notice of the acts and/or omissions engaged in by the Respondent and of the Texas Rules of Professional Conduct that the [CDC] contends are violated by the alleged acts and/or omissions." TEX. RULES DISCIPLINARY P. R. 2.14.D.

Upon receipt of this just cause notice, the respondent has a choice of forum in which the resulting disciplinary proceeding will be heard. At the respondent's election, the disciplinary proceeding can be heard by either an evidentiary panel of the appropriate district grievance committee, or by a district court of proper venue, with or without a jury. TEX. RULES DISCIPLINARY P. R. 2.15. This election "must be in writing and served upon the [CDC] no later than twenty days *after the Respondent's receipt of written notification*" of the just cause determination and allegations against him. *Id*. (emphasis added). And the respondent's "failure to

37

timely file an election shall conclusively be deemed as an affirmative election to proceed [before an Evidentiary Panel]." *Id.*

If the respondent makes a timely election to proceed before a district court, the CDC must notify the Presiding Judge of the administrative judicial region covering the county of appropriate venue within 60 days by forwarding to the Presiding Judge a copy of the disciplinary petition. TEX. RULES DISCIPLINARY P. R. 3.01. Upon receipt of the disciplinary petition, the Presiding Judge assigns an active district judge whose district does not include the county of appropriate venue to preside over the disciplinary case. TEX. RULES DISCIPLINARY P. R. 3.02. "If an active district judge assigned to a disciplinary case becomes a retired, senior, or former judge, he or she may be assigned by the Presiding Judge to continue to preside in the case, provided the judge has been placed on a visiting judge list." TEX. RULES DISCIPLINARY P. R. 3.02.A.

### B. The District Court's Judgment of Disbarment Is Not Void for Lack of Subject Matter Jurisdiction.

Powell's jurisdictional argument is based on Texas Rule of Disciplinary Procedure 2.15's forum-election provision. Rule 2.15 directs that respondent attorneys "shall notify" the Commission's CDC of "whether the Respondent seeks to have the Complaint heard in a district court of proper venue, with or without a jury, or by an Evidentiary Panel of the Committee." TEX. RULES DISCIPLINARY P. R. 2.15. It requires that this "election must be in writing and served upon the [CDC] no

38

later than twenty days after the Respondent's receipt of written notification" from the CDC of its determination that just cause exists to proceed with the complaint. *Id.* "A Respondent's failure to timely file an election shall conclusively be deemed as an affirmative election to proceed [before an evidentiary panel]." *Id.*

Powell contends this Rule blocks the district court's subject matter jurisdiction because he did not notify the CDC of his election to proceed in district court before the expiration of the 20-day response period. The CDC first notified Powell that it had determined just cause existed to proceed with the complaint against him in a March 8, 2021 email to his lawyer, Ketterman. The email attached both the CDC's just cause determination and a form for Powell to make his election. Neither Powell nor his Ketterman responded to this March 8 email, so the Commission re-sent the just cause determination and election form in a follow-up email to Ketterman on May 5, 2021. This time, Ketterman responded by email the next day, writing "[p]lease see the attached Election of Jury Trial by Frank Powell."

Consistent with that election, the case proceeded in the district court below for the next 15 months, progressing through extensive discovery, significant pretrial motion practice, and ultimately a jury trial—without objection to the district court's jurisdiction. But in his post-judgment motions and on appeal, Powell argues his failure to respond to the Commission's original March 8, 2021 email within Rule 2.15's 20-day period means "the district court lacked subject matter jurisdiction over

39

this disciplinary matter because the timely election is a condition precedent to trigger district court jurisdiction."

We disagree. Rule 2.15 is not a jurisdictional requirement. In determining whether Rule 2.15's forum-election provision is jurisdictional, we begin with the presumption that the district court had subject matter jurisdiction over Powell's disciplinary case. *See S.C. v. M.B.*, 650 S.W.3d 428, 436 (Tex. 2022) (we must "presume that remedies remain intact and that the jurisdiction of a district court— our state's sole court of general jurisdiction—remains undisturbed"). This presumption arises from the fact that Texas district courts are courts of general jurisdiction with "exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by [the Texas] Constitution or other law on some other court, tribunal, or administrative body." TEX. CONST. art. V, § 8; *accord* TEX. GOV'T CODE §§ 24.007(a) (district courts have "the jurisdiction provided by Article V, Section 8, of the Texas Constitution"), .008 (district courts "may hear and determine any cause that is cognizable by courts of law or equity and may grant any relief that could be granted by other courts of law or equity"). "Thus, *all claims* are presumed to fall within the jurisdiction of the district court unless the Legislature or Congress has provided that they *must be* heard elsewhere." *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75 (Tex. 2000) (emphasis added).

This presumption is not easy to overcome. There must be a "clear legislative intent to that effect," *Tex. Windstorm Ins. Ass'n v. Pruski*, 689 S.W.3d 887, 891 (Tex. 2024) (citation and internal quotation omitted), and without a "clear legislative intent" we "resist classifying a provision as jurisdictional." *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 391 (Tex. 2014). The rationale behind requiring a "compelling showing" of legislative intent to deprive district courts of jurisdiction, *S.C.*, 650 S.W.3d at 436, is "to reduce the vulnerability of final judgments to attack on the ground that the tribunal lacked subject matter jurisdiction." *Dubai Petroleum*, 12 S.W.3d at 76 (citation and internal quotation omitted). And Powell admits that, as "the party resisting the district court's jurisdiction," he bears the burden of establishing the Legislature's intent to divest the trial court of subject matter jurisdiction over his disciplinary case. *Pape Partners, Ltd. v. DRR Fam. Props. LP*, 645 S.W.3d 267, 272 (Tex. 2022).

Powell did not carry this burden. He argues first that the mandatory nature of Rule 2.15's election provision—requiring that respondent attorneys "shall notify" the CDC of their choice of forum within 20 days of receipt of the CDC's notice—makes the Rule jurisdictional. *See* TEX. RULES DISCIPLINARY P. R. 2.15. But "'just because a statutory requirement is mandatory does not mean that compliance with it is jurisdictional.'" *City of DeSoto v. White*, 288 S.W.3d 389, 395 (Tex. 2009) (quoting *Albertson's, Inc. v. Sinclair*, 984 S.W.2d 958, 961 (Tex. 1999)). In fact,

"[a] statute can be, and often is, mandatory without being jurisdictional." *Tex. Windstorm Ins. Ass'n*, 689 S.W.3d at 891. Therefore, the fact that Rule 2.15 is couched in mandatory language does not make it a jurisdictional requirement. *See id.*

Powell next contends Rule 2.15's *option* to proceed in district courts, read in light of the State Bar Act, provides the "clear legislative intent" necessary to divest the district court of jurisdiction. *See Crosstex Energy Servs.*, 430 S.W.3d at 391. Powell points out that the State Bar Act directs the Texas Supreme Court to establish disciplinary rules giving respondent attorneys "an option for a trial in a district court." *See* TEX. GOV'T CODE § 81.072(b)(7). It did so in Rule 2.15's election provision, which Powell reads as giving grievance committees of the State Bar of Texas "exclusive" jurisdiction over disciplinary proceedings *unless* the respondent attorney affirmatively "opts in" to district court jurisdiction by timely submitting an election form. In other words, Powell's argument is that Rule 2.15, as the implementation of the State Bar Act's directive to the Texas Supreme Court to give respondent attorneys an "option" to proceed in district court, makes the "default setting" that grievance committees have exclusive jurisdiction over disciplinary proceedings, with district courts having jurisdiction only *after* the respondent attorney timely submits an election to proceed in district court.

This argument is unpersuasive for several reasons. First, it is contradicted by the presumption that district courts have jurisdiction over "all claims," without a need to opt in. *Dubai Petroleum*, 12 S.W.3d at 75.

Second, this argument disregards the fact that the State Bar Act, by its terms, was passed "in aid of" the Texas Supreme Court's preexisting and inherent power to regulate the practice of law in Texas. TEX. GOV'T CODE § 81.011(b); *see also In re Nolo Press/Folk Law*, 991 S.W.2d at 769.

Third, it is contradicted by the rule that statutes show a "clear legislative intent" to divest district courts of subject matter jurisdiction. *Tex. Windstorm Ins. Ass'n*, 689 S.W.3d at 891. Rule 2.15's election provision makes no such showing, as demonstrated by comparing it to a statute that *does* create a jurisdictional prerequisite to suit. *See, e.g.*, TEX. GOV'T CODE § 311.034 ("statutory prerequisites to a suit, including the provision of notice, are *jurisdictional requirements* in all suits against a government entity" (emphasis added)). Without this sort of clear legislative intent, we must be "reluctant to conclude that a provision is jurisdictional." *City of DeSoto*, 288 S.W.3d at 393; *accord Dubai Petroleum*, 12 S.W.3d at 76 ("[T]he modern direction of policy is to reduce the vulnerability of final judgments to attack on the ground that the tribunal lacked subject matter jurisdiction." (citation and internal quotation omitted)).

And finally, Powell's argument would give exclusive jurisdiction over disciplinary cases to an agency of the judiciary until a litigant "opts in" to district court jurisdiction, which is contrary to both the presumption of district court jurisdiction over "all claims," *Dubai Petroleum*, 12 S.W.3d at 75, and the Texas Supreme Court's direction on agency jurisdiction. "[T]here is no presumption that administrative agencies are authorized to resolve disputes. Rather, they may exercise only those powers the law, in clear and express statutory language, confers upon them. . . . An agency has exclusive jurisdiction when a pervasive regulatory scheme indicates that [the Legislature] intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 220–21 (Tex. 2002) (citation and internal quotation omitted). Because Rule 2.15 gives respondent attorneys the *option* of proceeding either in district court or before a grievance committee, it cannot be considered a "pervasive regulatory scheme" indicating the Legislature wanted the State Bar to be the "exclusive means" of dealing with disciplinary violations. *See id*.

In addition, "we apply statutory construction principles" when interpreting the Texas Rules of Disciplinary Procedure, *In re Caballero*, 272 S.W.3d 595, 599 (Tex. 2008) (citing *O'Quinn v. State Bar of Tex.*, 763 S.W.2d 397, 399 (Tex. 1988) ("[O]ur disciplinary rules should be treated like statutes.")), and application of those

44

principles confirms our conclusion that Rule 2.15 is not jurisdictional. "We may consider: (1) the plain meaning of the statute; (2) the presence or absence of specific consequences for noncompliance; (3) the purpose of the statute; and (4) the consequences that result from each possible interpretation." *Crosstex Energy Servs.*, 430 S.W.3d at 392 (citations and internal quotation omitted)).

Each of these factors counsels against reading Rule 2.15's forum-election provision as a jurisdictional requirement. The first, the Rule's plain meaning, gives no indication that it is intended to be jurisdictional. As we described above, Rule 2.15's language lacks the "clear legislative intent" that it is intended to create a jurisdictional bar, and thus its text shows that it is mandatory but not jurisdictional. *See Tex. Windstorm Ins. Ass'n*, 689 S.W.3d at 891.

The second factor, which looks at the presence or absence of specific consequences for noncompliance, also indicates Rule 2.15 is not jurisdictional. Powell argues to the contrary because Rule 2.15 contains an express consequence for noncompliance—it states that a respondent attorney's failure to timely elect to proceed in district court "shall conclusively be deemed as an affirmative election to proceed [before a grievance committee]." TEX. RULES DISCIPLINARY P. R. 2.15. According to Powell, the presence of a consequence for noncompliance in the statutory text automatically makes it jurisdictional. But Texas law is to the contrary. *See Morath v. Lampasas Indep. Sch. Dist.*, 686 S.W.3d 725, 743 (Tex. 2024) ("And

45

even if the Legislature intended there to be judicially enforceable consequences for noncompliance with a mandatory duty, this does not mean that compliance is necessarily jurisdictional." (citation and internal quotation omitted)). And here, the consequence for noncompliance with Rule 2.15 is borne by the respondent attorney, because it eliminates his option to elect the forum in which his disciplinary case will be heard. TEX. RULES DISCIPLINARY P. R. 2.15. Nothing in the Rule's text suggests the consequence is to divest district courts of jurisdiction altogether.

The third factor looks at Rule 2.15's purpose. Its purpose is to give respondent attorneys an option to have their disciplinary cases heard before a district court or a grievance committee. *See Washington v. Comm'n for Law. Discipline*, No. 03-15-00083-CV, 2017 WL 1046260, at *3 n.3 (Tex. App.—Austin Mar. 17, 2017, pet. denied.). Because the Rule's purpose is to give respondent attorneys a choice of forum, this factor also weighs against a conclusion that Rule 2.15 strips district courts of jurisdiction.

The same is true of the fourth factor—the consequences from each possible interpretation. A conclusion that Rule 2.15 is jurisdictional, particularly in the absence of a clear legislative intent to that effect, would leave judgments in disciplinary proceedings vulnerable to attack. *Cf. In re Guardianship of Fairley*, 650 S.W.3d 372, 379 (Tex. 2022) ("Partly out of a desire to reduce the vulnerability of final judgments to attack, . . . we are reluctant to conclude that a statutory

requirement affects a court's subject-matter jurisdiction absent clear legislative intent to that effect.") (citation and internal quotation omitted)). Either party—whether the respondent attorney or the Commission—could proceed through a jury trial and then, when one of them is inevitably dissatisfied with the result, attack the resulting judgment on jurisdictional grounds. Virtually every judgment in a disciplinary case tried in district court would be subject to attack. Construing Rule 2.15 to divest district courts of jurisdiction over disciplinary proceedings thus leads to absurd results. *See Jose Carreras, M.D., P.A. v. Marroquin*, 339 S.W.3d 68, 73 (Tex. 2011) ("We also interpret statutes to avoid an absurd result.").

Accordingly, we conclude Rule 2.15's forum-election provision is not a jurisdictional requirement. Even assuming Powell failed to make a timely election to proceed in district court, that failure would not divest the district court of subject matter jurisdiction.

We overrule Powell's first issue.

## II. The District Judge Had Authority to Issue the Judgment of Disbarment.

In his second issue, Powell contends the district court's judgment of disbarment is "void" because Judge Holder lacked authority to enter it. Powell makes three supporting arguments. First, he contends that Presiding Judge Brown's initial assignment of Judge Holder to preside in his disciplinary proceedings was improper. Second, he claims the Presiding Judge's re-assignment of Judge Holder,

after her retirement, to preside over post-judgment proceedings was improper. And finally, Powell contends that upon retirement, Judge Holder failed to follow the timing requirements in Texas Government Code Section 75.001 for retiring judges to notify the Chief Justice of the Texas Supreme Court of her intention to continue serving as a senior judge. These arguments lack merit.

## A.    The Sequence of Relevant Events.

Because the specific dates of various events are important to an understanding of Powell's arguments that the judgment of disbarment against him is void, setting out a timeline of relevant events may help before we turn to the arguments themselves:

| Date | Event |
| --- | --- |
| October 26, 2020 | A grievance is filed against Powell with the Commission. |
| July 2, 2021 | The CDC requests a judicial assignment for the disciplinary action against Powell. |
| August 26, 2021 | Presiding Judge Brown issues an order assigning Judge Holder to preside over Powell's disciplinary case. |
| December 5-14, 2022 | Jury trial of liability phase of Powell's disciplinary case. |
| December 19, 2022 | Judge Holder conducts a non-jury sanctions hearing. |
| December 28, 2022 | Judge Holder signs judgment of disbarment. |
| December 31, 2022 | Effective date of Judge Holder's retirement. |
| January 17, 2023 | Powell files a "Request for Assignment of Trial Judge" in the trial court below, stating that he expects to file post-judgment motions that "must be heard by an active judge from another county, *appointed by Hon. Susan Brown*." (Emphasis added.) |

48

| Date | Event |
|---|---|
| January 25, 2023 | Powell files a "Request for Immediate Assignment of Judge by the Texas Supreme Court" in the trial court below, stating that he expects to file post-judgment motions that "must be heard by an active judge from another county, *assigned by the Texas Supreme Court*." (Emphasis added.) Although he filed it in the trial court below, Powell sent a copy of this request to the Clerk of the Supreme Court of Texas by email. |
| January 25, 2023 | Date of Judge Holder's letter to the Chief Justice of the Texas Supreme Court to inform him of her retirement and her election to continue serving as a senior judge under Texas Government Code Section 75.001. This letter was attached to an email that Judge Holder sent to the Chief Justice on February 20, 2023 (see below). |
| January 27, 2023 | Powell files a "Motion to Vacate and Set Aside December 28, 2022 Judgment, and in the Alternative, Motion for New Trial," in which he argues for the first time that the district court lacked subject matter jurisdiction over his disciplinary case and that the assignment of Judge Holder to preside over the case was improper. |
| February 2, 2023 | Presiding Judge Brown issues an order reassigning Judge Holder to preside over the post-judgment proceedings in Powell's disciplinary action after her retirement. |
| February 2, 2023 | Powell files an "Objection to the Assignment Made by the Presiding Judge of the Eleventh Judicial Administrative Region & Emergency Request for Assignment of Judge by the Texas Supreme Court." Although Powell sent a copy of this objection to the Clerk of the Texas Supreme Court and directed it to "the Honorable Justices of the Supreme Court of Texas," he filed it in the district court below. |
| February 15, 2023 | The trial court conducts a hearing on Powell's motion for new trial with Judge Holder presiding. Judge Holder |

| Date | Event |
|------|-------|
| | issues findings of fact and conclusions of law on the motion for new trial. |
| February 20, 2023 | Judge Holder emails the Texas Supreme Court, attaching her January 25, 2023 letter to Chief Justice Hecht notifying him of her retirement and election to continue serving as a senior judge. |
| February 24, 2023 | Judge Holder denies Powell's motion for new trial. |
| February 27, 2023 | Chief Justice Hecht sends a letter to Judge Holder acknowledging her notice of retirement and election to serve as a senior judge. |

Having set out the timeline of relevant events, we turn to Powell's arguments that the judgment is void because Judge Holder lacked authority to enter it.

## B.     Powell Waived Any Objections to Presiding Judge Brown's Initial Assignment of Judge Holder to Preside Over His Disciplinary Case.

Powell's first argument on this issue is that Presiding Judge Brown's initial assignment of Judge Holder to preside over his disciplinary case, in August 2021, was improper. Powell makes this argument based on Texas Rule of Disciplinary Procedure 3.02. Rule 3.02 describes the process by which judges are assigned to disciplinary cases in district courts. *See* TEX. RULES DISCIPLINARY P. R. 3.02. Central to Powell's argument, the Rule was amended during the pendency of Powell's disciplinary case. Powell contends the former version applies, and thus that the appointment of Judge Holder under the amended (and current) version of the Rule was error. We conclude that Powell waived this argument.

50

The Texas Supreme Court amended Rule 3.02 by order dated May 25, 2021 ("May 2021 SCOTX Order").[3] The amendments took effect July 1, 2021. *See* May 2021 SCOTX Order at 1, ¶ 5. Under Texas Rule of Disciplinary Procedure 1.04, "[a]ll disciplinary and disability proceedings commenced prior to the effective date of these rules as amended are governed by the Texas Rules of Disciplinary Procedure *in effect as of the date of commencement* of said disciplinary and disability proceedings." TEX. RULES DISCIPLINARY P. R. 1.04 (emphasis added). The disciplinary proceedings against Powell began in October 2020, nine months before the amendments to Rule 3.02 took effect. *See* May 2021 SCOTX Order at 1, ¶ 5. Thus, Powell contends, the former version of Rule 3.02 applies.

Under the *former* version of Rule 3.02, the Texas Supreme Court appoints a judge to preside over attorney disciplinary actions. *See* (former) TEX. RULES DISCIPLINARY P. R. 3.02 ("Upon receipt of a Disciplinary Petition, the Clerk of the Supreme Court of Texas shall promptly bring the Petition to the attention of the Supreme Court. *The Supreme Court shall promptly appoint* an active district judge who does not reside in the Administrative Judicial District in which the Respondent resides to preside in the case." (emphasis added)); May 21 SCOTX Order at 36. But under the *current* version of Rule 3.02, the Presiding Judge of the appropriate

---

3    *Final Approval and Adoption of Amendments to the Texas Disciplinary Rules of Professional Conduct and the Texas Rules of Disciplinary Procedure*, entered May 25, 2021, Misc. Docket No. 21-9061, at 36 (*reprinted in* TEX. B. J. 630, 646 (2021)).

administrative judicial district makes the assignment. *See* (current) TEX. RULES DISCIPLINARY P. R. 3.02 ("Upon receipt of a Disciplinary Petition, *the Presiding Judge shall assign* an active district judge whose district does not include the county of appropriate venue to preside in the case." (emphasis added)).

The initial assignment of Judge Holder was made under the *current* version of Rule 3.02. Upon receipt of Powell's election to have his disciplinary case heard in district court, the CDC forwarded its disciplinary petition against him to Presiding Judge Brown for assignment. Presiding Judge Brown then assigned the case to Judge Holder. Powell claims this was error, because the former version of Rule 3.02 was in effect when his disciplinary proceedings commenced, and the former version of Rule 3.02 would have required the Texas Supreme Court—not Presiding Judge Brown—to assign the judge that would preside in his case. Powell contends that because the assignment was made under the current rather than former version of Rule 3.02, "Judge Holder was not authorized" to serve as the judge in his case, and thus that the judgment of disbarment is void.

Powell also says this error in the assignment of Judge Holder is not one that can be waived because the authority of a judge to preside in a case is analogous to subject matter jurisdiction. In support, Powell cites *Lackey v. State*, which states that "the authority of the judge to act as such cannot be waived—just as the subject-matter jurisdiction of a court cannot be waived." 322 S.W.3d 863, 869 (Tex. App.—

52

Texarkana 2010), *aff'd*, 364 S.W.3d 837 (Tex. Crim. App. 2012). Thus, according to Powell, his extensive participation in 15 months of pretrial proceedings, discovery, and motion practice, as well as a jury trial, all without objection to Judge Holder's assignment, is immaterial.

We disagree. There is a difference between a lack of judicial authority due to a "procedural irregularity" in the judge's appointment versus a lack of judicial authority due to the judge's constitutional or statutory disqualification. *Wilson v. State*, 977 S.W.2d 379, 380 (Tex. Crim. App. 1988). The former can be waived; the latter cannot. *Davis v. Crist Indus., Inc.*, 98 S.W.3d 338, 342 (Tex. App.—Fort Worth 2003) (pet. denied) ("If a judge is disqualified by constitution or statute, it is not that the judge had no jurisdiction, but that the judge had no authority to act. If a putative judge does not have the prescribed qualifications to act or if a judge is disqualified because of relationship to the case or a party, then that judge has no authority, and her actions are a nullity. If, however, the complaint is that the judge acted in a case without statutory or procedural authority, the alleged error is not void, but voidable, and must therefore be raised by objection or complaint to be preserved for appellate review." (footnote omitted)). And that is why *Lackey*—the case that Powell cites—states that "the authority of the judge *to act as such* cannot be waived." 322 S.W.3d at 869 (emphasis added; footnotes omitted).

In other words, where a judge is otherwise qualified to act as a judge, procedural defects in her assignment are waivable. *Williams v. State*, No. 07-15-00294-CR, 2016 WL 6024348, at *3 (Tex. App.—Amarillo Oct. 13, 2016, no pet.) (mem. op.; not designated for publication) ("[W]hen the judge is otherwise qualified and the error is merely procedural, the order is only voidable and can be waived."). For this reason, "[i]n more than one case, courts have recognized that an appellant may not object, for the first time on appeal, to a procedural irregularity in the assignment of a former judge who is otherwise qualified." *Merlo v. Lopez*, No. 01-19-00102-CV, 2021 WL 278060, at *8 (Tex. App.—Houston [1st Dist.] Jan. 28, 2021) (mem. op.). "Although these holdings are in the context of criminal appeals, we find no reason to reach a different result in this civil appeal." *Id*.

Because procedural irregularities in the assignment of a judge to a case are waivable, litigants who wish to object on that basis generally must do so *before* trial. *Wilson*, 977 S.W.2d at 380 ("How then, may a defendant challenge the authority of a trial judge, who is otherwise qualified, to preside pursuant to an expired assignment? We hold that such a defendant, if he chooses, may object *pretrial*; if he does not, he may not object later or for the first time on appeal." (emphasis added)). The reason for this requirement is plain: "A timely objection in the trial court will afford both the trial judge and the State notice of the procedural irregularity and an adequate opportunity to take corrective action." *Id*. at 380–81; *see also Lackey*, 364

S.W.3d at 846. And this requirement aligns with Texas law that "in general, all but the most fundamental evidentiary and procedural rules (or 'rights') are forfeited if not asserted at or before trial." *Wilson*, 977 S.W.2d at 380.

Therefore, even assuming Judge Holder's assignment to this case should have been by the Texas Supreme Court under former Rule 3.02 rather than by Presiding Judge Brown under the current Rule 3.02, the question is whether the assignment was a "procedural irregularity" that can be waived, *Wilson*, 977 S.W.3d at 380, or a nonwaivable, constitutional or statutory infirmity that disqualified her from acting as a judge altogether.

We conclude it was a waivable procedural irregularity, a conclusion confirmed by *Wilson*. There, the Texas Court of Criminal Appeals held that an order appointing an otherwise qualified visiting judge that had expired two days before the trial started was a procedural irregularity that the defendant needed to raise pretrial. *Id.* at 381. By contrast, the Court of Criminal Appeals reversed a conviction because the record did not reflect compliance with the (since repealed) statutory requirement that the presiding judge of a county criminal court be absent, disabled, or disqualified at the time of trial to authorize a retired judge to sit. *Herrod v. State*, 650 S.W.2d 814, 817–18 (Tex. Crim. App. 1983). That is, the trial judge in *Herrod* had an unfulfilled statutory prerequisite to serve as a judge that precluded him from sitting, *see id.*, but the judge in *Wilson* was otherwise qualified to sit as a judge. *See* 977

55

S.W.2d at 380. The only issue was a defect in how he was appointed—a procedural irregularity. *See id.*

The assignment of Judge Holder under the current rather than the former version of Rule 3.02—assuming that was an error—is closer to the procedural irregularity in *Wilson* than the statutory disqualification in *Herrod. Accord Carmody v. State Farm Lloyds*, 184 S.W.3d 419, 422–23 (Tex. App.—Dallas 2006, no pet.) (after judge's recusal, assignment of new judge by local administrative judge, rather than by presiding judge of administrative judicial district as required by TEX. R. CIV. P. 18a, was procedural error requiring pretrial objection); *Martinez v. State*, No. 01-09-00562-CR, 2010 WL 2025767, at *2 (Tex. App.—Houston [1st Dist.] May 20, 2010, no pet.) (mem. op., not designated for publication) (lack of written order assigning visiting judge at time of trial was procedural error requiring pretrial objection). Powell was thus required to object to Judge Holder's assignment before the trial of his disciplinary case began. *See Wilson*, 977 S.W.2d at 380.

Powell failed to meet this requirement. He participated fully in pretrial proceedings, discovery, motion practice, and a multi-day jury trial without objecting to Judge Holder's assignment. Only after trial was concluded and the judgment of disbarment had been entered against him did Powell raise this objection, for the first time, in his motion for new trial. Powell thus waived this objection by not making it before trial. *See id.*; *Kneip v. State*, No. 04-01-00021-CR, 2001 WL 883609, at *1

56

(Tex. App.—San Antonio Aug. 8, 2001, no pet.) (not designated for publication) ("The acts of a judge who is constitutionally disqualified are void, and a defendant may challenge the judge's authority to act for the first time on appeal. However, the acts of a judge who is qualified and not constitutionally or statutorily disqualified are not void because of procedural irregularities." (citations omitted)).

## C. Powell Waived His Argument About Presiding Judge Brown's Re-assignment of Judge Brown for Post-Trial Proceedings.

Powell next argues that Judge Holder's denial of his post-judgment motions is void because Presiding Judge Brown acted improperly when she re-assigned Judge Holder to preside over the post-judgment proceedings after Judge Holder's retirement. Again, Powell argues that based on Texas Rule of Disciplinary Procedure 3.02, any judicial assignment should have been made by the Texas Supreme Court under the former version of Rule 3.02 rather than by Presiding Judge Brown under the current version of Rule 3.02. (Powell also makes additional arguments about Judge Brown's re-assignment following her retirement, which we address below.)

Judge Holder retired effective December 31, 2022, shortly after she signed the judgment of disbarment on December 28. A few weeks later, on January 17, Powell filed a "Request for Assignment of Trial Judge" in the district court, specifically requesting that the appointment be made "by Hon. Susan Brown." But a week after that, Powell filed a "Request for Immediate Assignment of Judge by the Texas Supreme Court," requesting that a judge be assigned "by the Texas Supreme Court."

57

Although Powell filed this request for assignment by the Texas Supreme Court in the district court, he sent a copy of it to the Clerk of the Texas Supreme Court by email. The record does not reflect that the Texas Supreme Court acted on Powell's request.

As before, even assuming Presiding Judge Brown's re-assignment of Judge Holder post-retirement was in error because the assignment should have been made by the Texas Supreme Court under former Rule 3.02, any such error was procedural and thus subject to waiver. *See Wilson*, 977 S.W.2d at 380–81; *Carmody*, 184 S.W.3d at 422–23. And Powell waived this argument when he specifically asked Presiding Judge Brown to assign a judge for post-trial proceedings. Powell cannot complain on appeal because the trial court took the procedural step he asked it to take.

## D. Judge Holder Satisfied the Timing Requirements for Service as a Senior Judge.

Powell's final argument in support of his second issue is that any actions Judge Brown took post-retirement are void because she failed to meet the timing requirements of Texas Government Code Section 75.001 for retiring judges. Section 75.001 permits state district judges who meet certain eligibility requirements not at issue here to elect to become senior judges. *See* TEX. GOV'T CODE § 75.001(a). It states that such an election "may be made . . . not later than the 90th day after the date of the person's retirement in a document addressed to the chief justice of the

58

supreme court," or after "in a petition addressed to the supreme court." *Id.* § 75.001(b). Powell contends Judge Holder sent a letter to the Chief Justice of the Texas Supreme Court informing him of her election to become a senior judge more than 90 days after "her last term of office," and thus it was untimely and ineffective.

Judge Holder retired effective December 31, 2022. Section 75.001 gave her 90 days, or until March 31, 2023, to notify the Chief Justice of her retirement by letter. Judge Holder met that deadline. Her letter to the Chief Justice is dated January 25, 2023, and she sent it to him as an attachment to an email on February 20, 2023. The Chief Justice acknowledged Judge Holder's letter in a response dated February 27, 2023. Therefore, Judge Holder sent, and the Chief Justice received, her letter informing him of her election to become a senior judge well before the March 31, 2023 deadline in Section 75.001. *See id.*

Powell nevertheless contends Judge Holder's letter to the Chief Justice was ineffective for two reasons. He focuses first on the fact that Judge Holder presided over the hearing on his motion for new trial on February 15, 2023, five days before she emailed the Chief Justice the letter informing him of her election to serve as a senior judge. True, but that does not affect the fact that Judge Holder met the Section 75.001 deadline. *See id.* And in any event, Judge Holder had already been re-assigned to the case by Presiding Judge Brown's order of February 2, 2023 when she presided over (and denied) Powell's motion for new trial.

Second, Powell objects to Judge Holder's letter to the Chief Justice being dated one month before the transmittal email by which it was delivered to him. According to Powell, this "backdating of Judge Holder's pdf letter" signals that "five days after the hearing on the motion for new trial, Judge Holder apparently realized that she had not complied with her constitutional and statutory mandates to serve as a retired district court judge," which he characterizes as "intentional and improper." But the record does not indicate that Judge Holder "backdated" the letter "intentionally" or for an "improper" purpose—only that it was sent on a different day than it was signed. And as we have explained, Judge Holder sent the letter well before the Section 75.001 deadline. *See id.*

We overrule Powell's second issue.

## III. Judge Holder Was Not Constitutionally Disqualified from Presiding in Powell's Disciplinary Case.

In his third issue, Powell contends that all of Judge Holder's rulings, including the judgment of disbarment and the denial of his motion for new trial, are void because she was constitutionally disqualified from presiding in his disciplinary action. Powell claims Judge Holder was constitutionally disqualified because she did not take all the required oaths of office or sign all the necessary anti-bribery statements.

District court judges are required by the Texas Constitution to take an oath of office and sign an anti-bribery statement. *See* TEX. CONST. art. 16, § 1. They are

60

required to file these documents with the Texas Secretary of State, and they are required to do so "before they enter upon the duties of their offices." *Id.* A judge must re-take the oath and re-sign the statement each time she is elected. *Prieto Bail Bonds v. State*, 994 S.W.2d 316, 320 (Tex. App.—El Paso 1999, pet. ref'd). A judge's failure to meet these requirements can leave her constitutionally disqualified from service as a judge, and thus—unlike the procedural irregularities discussed above—render any action she takes void, and not merely voidable. *F.S. New Prods., Inc. v. Strong Indus., Inc.*, 129 S.W.3d 594, 598 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("The distinction between disqualification on constitutional grounds and disqualification based on the rules of procedure is crucial because appellant is correct in its claim that an order or judgment rendered by a constitutionally disqualified judge is void. Moreover, disqualification on constitutional grounds cannot be waived and may be raised even after the judgment is beyond appeal." (citations omitted)).

Yet we presume trial court proceedings were proper. *See Murphy v. Countrywide Home Loans, Inc.*, 199 S.W.3d 441, 444 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (discussing the "presumption of the regularity of trial court judgments and proceedings"). In fact, "it has long been a 'cardinal rule' of appellate procedure in Texas that we 'must indulge *every* presumption in favor of the regularity of the proceedings and documents' in the trial court." *Murphy v. State*, 95

61

S.W.3d 317, 320 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (emphasis in original)). This presumption applies to challenges to a judge's alleged failure to take the oath of office. *Countrywide Home Loans*, 199 S.W.3d at 444 ("[T]he presumption of the regularity of trial court judgments and proceedings applies to appellate challenges of visiting trial court judges for alleged failures to take their constitutionally required oaths."). Because of this presumption, the burden falls on Powell to overcome it with "evidence of impropriety." *Murphy*, 95 S.W.3d at 320.

Powell failed to carry this burden. Judge Holder was elected to the bench in 2010, 2014, and 2018. Powell requested records showing that she took the oath and signed the statement from the Texas Secretary of State, the Texas Supreme Court, and Presiding Judge Brown for each of those years, as well as after she retired. In response, Powell received documents showing that Judge Holder filed the oath and statements with the Secretary of State's Office after her 2010 and 2014 elections. But he did not receive documents showing that Judge Holder filed them after she was elected to the bench in 2018, or immediately after her retirement. Based on the absence of these records, Powell concludes that "Judge Holder does not appear to have taken all required oaths of office," and that "Judge Holder is disqualified because of the failure to take and file the oaths of office, and the anti-bribery statements."

The absence of these records from the Secretary of State's Office does not satisfy Powell's burden to come forward with "evidence of impropriety," that is, evidence affirmatively showing that Judge Holder failed to take the required oaths and sign the anti-bribery statements. *Id.* "[A] lack of filing of any required oath is not proof, in itself, of the failure of the judge to take the constitutionally required oaths." *Id*. at 320 n.3. In part, this is because "assuming that the oaths were not filed, . . . does not establish that they were not taken." *Thomas v. Burkhalter*, 90 S.W.3d 425, 427 (Tex. App.—Amarillo 2002, pet. denied). "Nor can the missing evidence be supplied through our taking 'judicial notice' of the records of the Secretary of State." *Id*.; *accord Espinosa v. State*, 115 S.W.3d 64, 66 (Tex. App.—San Antonio 2003, no pet.) ("The failure to file the oath with the Secretary of State does not vitiate the oath or deprive the judge of the authority to preside in a case."). Powell's reliance on the *absence* of records from the Secretary of State is thus not enough to meet his burden of coming forward with the *evidence* necessary to overcome the presumption of the propriety of Judge Holder's presiding over his disciplinary action. *See Countrywide Home Loans*, 199 S.W.3d at 444.

The only affirmative evidence that Powell relies on to support his constitutional disqualification argument is the logbook of the notary who notarized Judge Holder's signature on the oath of office she took on February 1, 2023. Judge Holder's signature on the oath is itself not dated, but the notarization is dated

February 1, 2023. Powell requested a copy of the notary's logbook, which reflects that the notary notarized Judge Holder's signature on February 3, 2023, and not two days earlier.

Powell attaches significance to this discrepancy because Presiding Judge Brown signed the order re-assigning Judge Holder to preside over his case following her retirement on February 2, 2023—one day after the notarization date on Judge Holder's oath of office, and one day before the date reflected in the notary's logbook. Powell claims the logbook is thus evidence that Judge Holder's oath "was backdated," "is neither credible nor reliable," is "false," and "raises significant concerns about the credibility and reliability of the timeliness of Judge Holder's Oath and . . . the specter of some sort of misconduct." According to Powell, "[t]he significance of the mismatched dates cannot be overstated."

We do not see the same significance. There are any number of explanations for the date discrepancy, and Powell offers no evidence to support his apparent theory of a conspiracy between Judge Holder and the notary. More likely, the discrepancy was a clerical error by the notary as she was recording the notarization in her logbook. After all, the notarization on the oath itself states that it was done on February 1, 2023, the day before Presiding Judge Brown's order of re-assignment. And even if the notary had joined some sort of backdating conspiracy, it would have had little (if any) practical significance.

64

Assuming Judge Holder had signed the oath on February 3 and then persuaded the notary to backdate it two days, Judge Holder still would have signed the oath almost two weeks before the February 15 hearing on Powell's motion for new trial, and almost three weeks before she signed the order denying the motion for new trial, the first actions she took after her re-assignment. Thus, while it is *possible* the date discrepancy in the logbook "raises the specter of some sort of misconduct," it is far more plausible to conclude the error was a clerical mistake. Powell's speculation about the logbook reflecting "some sort of misconduct" thus does not overcome "the cardinal rule of appellate procedure in Texas that we must indulge *every* presumption in favor of the regularity of the proceedings and documents in the trial court." *Murphy*, 95 S.W.3d at 320 (citation and internal quotation omitted).

We overrule Powell's third issue.

## IV. The District- Court Properly Admitted into Evidence a Redacted Version of Findings of Fact and Conclusions of Law from the Custody Case.

In Powell's fourth issue, he contends the district court committed reversible error by admitting into evidence a redacted version of the findings of fact and conclusions of law from the Custody Case. Powell argues the custody court's findings and conclusions were inadmissible for two reasons: first, because they are a "void order" that he has appealed; and second, because they invade the province of the jury by concluding that Powell engaged in "numerous acts of sanctionable conduct" during the Custody Case. According to Powell, this conclusion answers

the question the jury was tasked with deciding in this disciplinary proceeding, that is, whether Powell engaged in sanctionable conduct.

Powell has waived these arguments. At trial, he agreed—multiple times—to the admission of the findings and conclusions from the Custody Case. Powell and the Commission at first disagreed about the admissibility of an unredacted copy of the findings and conclusions. But after further negotiations, Powell's counsel agreed to admit a redacted version, and that redacted version became Petitioner's Exhibit 43.1. In reference to Exhibit 43.1, Powell's counsel told the trial court she "approved it," and "agreed that . . . [a]nywhere [the original unredacted version is] attached to an exhibit will be replaced by 43.1." And then again at the exhibits conference, Powell's counsel said she "agreed" that "Petitioner's exhibits, all exhibits 12 through 56, should go back [to the jury] with the exception of Number 44 and Number 19." Powell thus agreed to the admission of the findings and conclusions from the Custody Case, and in doing so waived the argument he now makes on appeal. *See* TEX. R. APP. P. 33.1; *Bay Area Healthcare Grp. Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007) ("Error is waived if the complaining party allows the evidence to be introduced without objection.").

But we would not find reversible error even if Powell had properly preserved this argument because the trial court did not abuse its discretion by admitting the redacted version of the findings and conclusions from the Custody Case.

## A.    Standard of Review.

The decision whether to admit evidence at trial generally lies within the trial court's discretion, *see McShane*, 239 S.W.3d at 234, and thus we review a trial court's admission of evidence under the abuse of discretion standard. *See, e.g.*, *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005); *Dupree v. Boniuk Interests, Ltd.*, 472 S.W.3d 355, 369 (Tex. App.—Houston [1st Dist.] 2015, no pet.). A trial court abuses its discretion if it acts without reference to any guiding rules or principles or its decision is arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

When reviewing matters committed to the trial court's discretion, we may not substitute our judgment for that of the trial court. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). And we must "uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling." *Owens-Corning Fiberglass Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

## B.    The District Court Did Not Abuse Its Discretion in Admitting the Redacted Findings and Conclusions.

Powell's first basis for claiming that the district court's admission of the findings and conclusions was an abuse of discretion is that they constitute a "void order" that he has appealed. Powell's only supporting argument is that the custody court entered the findings and conclusions "without plenary power and without jurisdiction," though he provides neither an explanation of these statements nor

citation of any authorities to support them. *Cf.* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Abdelnour v. Mid Nat'l Holdings, Inc.*, 190 S.W.3d 237, 241 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Issues on appeal are waived if an appellant fails to support his contention by citations to appropriate authority or cites only to a single non-controlling case."). And in any event, a separate panel of this Court has affirmed the judgment entered in the Custody Case. *See Powell v. Fletcher*, No. 01-22-00640-CV, 2024 WL 4885846, at *1 (Tex. App.—Houston [1st Dist.] Nov. 26, 2024, no pet. h.) (mem. op.). Accordingly, we conclude Powell's argument that the findings and conclusions should not have been admitted because they are "void" is without merit.

Powell also claims the district court abused its discretion by admitting the findings and conclusions because their conclusion that Powell engaged in "sanctionable conduct" invaded the province of the jury. Powell says this finding means the family court conducted a "*de facto* disciplinary action against Powell," which it had no authority to do. But again, Powell cites no relevant authority to support this argument, *cf.* TEX. R. APP. P. 38.1(i), and, as Powell admits, the findings and conclusions do not discuss "the specific disciplinary rules Powell is alleged to have violated." And Texas courts have allowed findings and judgments from underlying cases to be admitted into evidence in resulting disciplinary actions. *See,*

*e.g.*, *Comm'n for Law. Discipline v. Cantu*, 587 S.W.3d 779, 787 (Tex. 2019) (in disciplinary case arising out of underlying bankruptcy proceeding, "the trial court did not abuse its discretion by permitting [the bankruptcy judge] to testify or by admitting [the bankruptcy judge's] redacted Opinion"). Therefore, the district court did not abuse its discretion in admitting the redacted findings and conclusions from the custody case.

We overrule Powell's fourth issue.

**V.      The District Court Properly Denied Powell's Motion for New Trial.**

Powell's fifth issue claims the district court abused its discretion when it denied his motion for new trial. Although Powell moved for a new trial on multiple grounds, he appeals only the denial of that portion of the motion based on "newly discovered evidence." The "newly discovered evidence" Powell moved on was this Court's December 15, 2022 Order in Case No. 01-20-00322-CV, where we granted Powell's motion to withdraw as Catherine's counsel ("Withdrawal Order"). Powell contends that because the Withdrawal Order was entered the day after the jury delivered its verdict in his disciplinary action, it "materially impacts each of the jury questions and would probably (if not certainly) have changed the jury's answer."

The questions that Powell claims the jury would have answered differently had it been aware of the Withdrawal Order are:

1.      Do you find that while representing Catherine Molloy in [the Custody Case], Frank C. Powell failed to abide by his client,

69

Catherine Molloy's, decisions concerning the objectives and general methods of representation?

Answer "Yes" or "No."

Answer:  Yes

2.    Do you find that while representing Catherine Molloy in [the Custody Case], Frank C. Powell's representation of Catherine Molloy reasonably appeared to be or became adversely limited by Frank Powell's or Frank Powell's law firm, Evans and Powell LLC's, own interests?

Answer "Yes" or "No."

Answer:  Yes

3.    Do you find that Frank C. Powell knowingly used confidential information of Catherine Molloy to her disadvantage after his representation of Catherine Molloy concluded and that disclosure was not excused by an exception [allowed by TEXAS DISCIPLINARY RULE OF PROFESSIONAL CONDUCT 1.05(b)(3)]?

Answer "Yes" or "No."

Answer:  Yes

4.    Do you find that while representing Catherine Molloy in [the Custody Case], Frank C. Powell asserted or controverted an issue in that proceeding in the absence of reasonable belief that the basis for doing so was not frivolous?

Answer "Yes" or "No."

Answer:  Yes

5.    Do you find that while representing Catherine Molloy in [the Custody Case], Frank C. Powell took a position that unreasonably increased the costs or other burdens of the case or that unreasonably delayed resolution of the matter?

70

Answer "Yes" or "No."

Answer: __Yes__

6.   . . . .

7.   Do you find that upon termination of representation that Frank C. Powell failed to take steps to the extent reasonably practicable to surrender papers and property to which Catherine Molloy was entitled?

Answer "Yes" or "No."

Answer: __Yes__

During deliberations, the jury sent a question to the district court: "In reference to Question 3, what date did Frank Powells [sic] representation of Catherine Molloy conclude?" The court responded, "[y]ou will refer to the evidence as you heard it."

Powell argues the Withdrawal Order is relevant to each of these jury questions because it establishes December 15, 2022, as the date he withdrew from representing Catherine. And he claims it is particularly relevant to Question 3, given the jury's question during deliberations. Powell says that if the December 15, 2022 withdrawal date is inserted into the jury questions, it is "undeniable" that it would "rebut the [Commission's] allegations related to the questions submitted to jury" because the Withdrawal Order "vindicates Powell and negates the [Commission's] allegations and claims that Powell committed professional misconduct."

71

Powell's brief does not explain these conclusions. It simply lists the jury questions and then states, "[t]he date that Powell's representation ended, now established to be December 15, 2022 based on the [Withdrawal] Order, materially impacts each of the jury questions above. It would probably (if not certainly) have changed the jury's answers."

## A.     Powell Waived This Issue Due to Inadequate Briefing.

First, we conclude that Powell has waived his fifth issue by inadequately briefing it. *See* TEX. R. APP. P. 38.1(i). Powell's briefs do not explain his perceived significance of the December 15, 2022 withdrawal date. He merely points to the Withdrawal Order, says it is "relevant," and then concludes the jurors "probably (if not certainly)" would have answered the jury questions differently had they been aware of it. But most of the jury questions were not date-dependent, and without further explanation it is hard to see how or why the jurors would have reached contrary conclusions considering Powell's behavior both before and after December 15, 2022.

The jury answered "Yes" to Question No. 1, which asked whether Powell failed to abide by Catherine's decisions about the objectives and methods of representation. Why the December 15, 2022 withdrawal date would impact the jury's answer to this question in unclear. For example, the jury was presented with evidence that in late 2019 or early 2020, Catherine had instructed Powell to "nonsuit

72

the entire—the appeals, the whole thing." But after Powell continued to prosecute both the Custody Case and the appeals and mandamus actions arising out of it, including by filing multiple briefs and motions in this Court. Based on this and similar evidence of Powell's conduct in 2019 and 2020, it is not apparent how the December 15, 2022 withdrawal date set forth in the Withdrawal Order would have impacted the jury's affirmative answer to Question No. 1, let alone changed it. And Powell's briefing provides no such explanation.

Likewise, Question No. 2 asked the jury whether Powell's representation of Catherine was adversely limited by his own interests or those of his law firm. Why the December 15, 2022 withdrawal date would influence the jury's affirmative answer is just as unclear. For example, Powell testified he last spoke to Catherine in May 2020, after she sent her handwritten letter to the Fletchers, and after she had instructed him to dismiss the pending appeals. But the next month, Powell advanced the appeals that harmed Catherine's interests, such as asking this Court to appoint a guardian ad litem for her based on confidential health information he apparently obtained from her brother, who was a pro bono client of Powell's. Powell took these actions without consulting Catherine, apparently because he had a personal interest in continuing the appeals. And considering that he did so in June 2020, it is hard to see how the December 15, 2022 withdrawal date set forth in the Withdrawal Order

73

would impact the jury's response to Question No. 2. Again, Powell's briefing provides no explanation.

The same is true for Question No. 3, even considering the jury question on the date Powell's representation of Catherine ended. Question 3 asked whether Powell knowingly used Catherine's confidential information to her disadvantage after his representation of her ended. While this question is date dependent, it is not necessarily dependent on the December 15, 2022 withdrawal date. For instance, the jury heard evidence that the Custody Case judge determined Powell and his firm "have not had authority to represent Catherine Murrah Mulloy since September 21, 2019," and thus it could have found Powell's representation of Catherine concluded as of that date. And as we described above, Powell used Catherine's confidential health care information after September 2019 in support of his request for the appointment of an ad litem. Powell's briefing does not explain why the Withdrawal Order would change the jury's answer to Question No. 3.

Nor does it explain the effect of the Withdrawal Order on Question No. 4. Question No. 4 asked the jurors whether they found that Powell, "while representing Catherine Molloy" in the Custody Case, asserted or controverted an issue in the absence of a reasonable belief that doing so was not frivolous. The jury heard extensive evidence of frivolous positions Powell took during his representation of Catherine. For example, it heard evidence of Powell's June 2019 filings asserting

that Kevin had engaged in "family violence," despite Catherine's prior sworn discovery responses to the contrary, as a way to attack the MSA to which Catherine had previously agreed. Why the Withdrawal Order would have changed the jury's answer to Question No. 4 remains is unexplained.

Similarly, the Withdrawal Order would not have affected the jury's affirmative answer to Question No. 5, which asked whether Powell, "while representing Catherine Molloy" in the Custody Case, took a position that unreasonably increased the costs or other burdens of the case or unreasonably delayed its resolution. Powell's June 2019 filings alleging family violence to attack the MSA are one example of such a position, and Powell never explains how or why the Withdrawal Order would have changed the jury's response to this question.

And finally, Powell's briefing does not explain how the Withdrawal Order could have affected the jury's affirmative answer to Question No. 7, which asked whether Powell failed to take reasonably practicable steps to surrender Catherine's file after the representation. For the reasons set forth above, the jury reasonably could have concluded that Powell's representation of Catherine ended as early as September 2019. And the jury heard evidence that Powell failed to turn over Catherine's complete file to her new counsel, despite multiple requests in July and August 2020, which would explain its affirmative answer to Question No. 7.

75

Powell's briefing does not say why the Withdrawal Order would have resulted in a different outcome.

Powell's briefing implies that any reason the Withdrawal Order "negates" the Commission's allegations and would "produce a different result" should be self-evident. But, as explained, the effect of Withdrawal Order is unclear—and it is far from self-evident that the Withdrawal Order would have resulted in a different outcome at trial. Because he failed to explain the reasons behind this position, Powell has inadequately briefed the issue. *See* TEX. R. APP. P. 38.1(i); *Dowling v. Perez*, No. 01-22-00865-CV, 2024 WL 628871, at *1 (Tex. App.—Houston [1st Dist.] Feb. 15, 2024) (mem. op.) ("When an appellate issue is unsupported by argument or lacks citation to the record or legal authority, nothing is presented for review." (citing *Fredonia State Bank v. Gen. Am. Life Ins.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (discussing "long-standing rule" that inadequate briefing waives issue on appeal)).

B.     **The District Court Did Not Abuse Its Discretion in Denying Powell's Motion for New Trial.**

Even if Powell had not waived his fifth issue, we would overrule it because the district court did not abuse its discretion in denying Powell's motion for new trial.

1.     **Standard of Review.**

"A party seeking a new trial on grounds of newly-discovered evidence must demonstrate to the trial court that (1) the evidence has come to its knowledge since

76

the trial, (2) its failure to discover the evidence sooner was not due to lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material it probably would produce a different result if a new trial were granted." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). And "[w]hen a party seeks a new trial based on newly discovered evidence, the motion for new trial must verify that the evidence is true and correct." *Raymond v. Raymond*, 190 S.W.3d 77, 82 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

"We review a trial court's denial of a motion for new trial based on newly[] discovered evidence under an abuse of discretion standard[,] and we indulge every reasonable presumption in favor of the trial court's refusal to grant a new trial. *Patriacca v. Frost*, 98 S.W.3d 303, 307 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

### 2. Powell's Failure to Verify His Motion for New Trial Justifies Its Denial.

A motion for new trial based on newly discovered evidence must be verified. *Raymond*, 190 S.W.3d at 82. Powell's motion for new trial did not meet this requirement. The district court could properly deny the motion on this basis alone. *Yuen v. Fisher*, 227 S.W.3d 193, 205 (Tex. App.—Houston [1st Dist.] 2007) ("Yuen's motion for new trial is not verified. Accordingly, the trial court did not abuse its discretion in denying the motion based on the additional fact that it was not verified.").

### 3. The Withdrawal Order Is Unlikely to Produce a Different Outcome.

We would hold that the district court did not abuse its discretion in denying Powell's motion for new trial even if he had not waived the issue, and even if he had verified the motion. In reaching this holding, we assume without deciding that the Withdrawal Order qualifies as "newly discovered evidence," and that it satisfies the first three elements of the test for granting a new trial based on newly discovered evidence. *See Waffle House*, 313 S.W.3d at 813. We focus on the fourth element: whether the Withdrawal Order is "so material it probably would produce a different result if a new trial were granted." *Id*.

For the reasons explained above, it is not. Based on the evidence presented at trial, the jury reasonably answered the jury questions in the affirmative to find that Powell engaged in multiple acts of professional misconduct. Powell presents no argument, beyond his conclusory assertions, to suggest the Withdrawal Order "probably would produce a different result" if a new trial were granted. *Id*.

In addition, the Withdrawal Order was entered in just one of the many actions Powell initiated in this Court arising out of the Custody Case. Powell filed four such separate proceedings, two appeals and two mandamus actions: (1) a mandamus proceeding in No. 01-19-00621-CV, *see In re Molloy*, 2020 WL 4589760, at *1; (2) a direct appeal of the SAPCR Order in No. 01-19-00840-CV, *see Molloy*, 2021 WL 1618466, at *1; (3) another mandamus proceeding in No. 01-19-00894-CV, *see In*

*re Molloy*, 2021 WL 1618469, at *1–2; and (4) a direct appeal of Presiding Judge Brown's recusal order in No. 01-20-00322-CV, *see Powell*, 695 S.W.3d at 677.

Powell moved to withdraw in each of these four cases on June 30, 2020. In two of them (Nos. 01-19-00621-CV and 01-19-00840-CV), this Court granted Powell's motion to withdraw as Catherine's counsel in August 2020. And we dismissed as moot Powell's motion to withdraw in Case No. 01-19-00894-CV in an opinion issued in April 2021. *In re Molloy*, 2021 WL 1618469, at *1 n.4. Because Powell had withdrawn as Catherine's counsel in these proceedings well before December 15, 2022, it is hard to see how the Withdrawal Order—entered in a case that arose out of the same facts and raised generally the same issues as the other three—would "probably produce a different result" in a new trial. *See Waffle House*, 313 S.W.3d at 813. For this reason as well, the district court did not abuse its discretion in denying Powell's motion for new trial.

We overrule Powell's fifth issue.

**VI. Both the Jury's Verdict and the District Court's Sanction of Disbarment Are Supported by Legally and Factually Sufficient Evidence.**

In his sixth issue, Powell contends the evidence presented below was legally and factually insufficient to support either the jury's verdict or the trial court's sanction of disbarment. Powell has waived this issue due to inadequate briefing. And even if he had not, we conclude the evidence overwhelmingly supported the jury's verdict and the district court's sanction.

79

**A. Powell Waived His Sixth Issue Due to Inadequate Briefing.**

Powell's briefing contains no meaningful citation to the record in support of his claims of factual insufficiency. The jury found Powell violated six of the Texas Disciplinary Rules of Professional Conduct. For three of them, Powell's briefing does not include a single citation to the record other than citations to the jury charge itself. For the other three, Powell cites exhibits that were neither offered nor admitted at trial. Thus, he does not point to anything in the record to show error in the jury's verdict. And Powell does not offer any record references to show error in the district court's sanction of disbarment, other than citation to his request for findings the district court denied and citations to support his assertion that the Commission "did not allege Powell caused his client to take her own life."

Likewise, beyond setting out the standard of review and cursory recitations of some of the relevant disciplinary rules, Powell cites no legal authorities to support his sufficiency arguments. And he provides no explanation or analysis of why either the verdict or the sanction is legally or factually insufficient.

Powell "may not obtain appellate review of an issue by making bare assertions of error and failing to provide legal authority supporting his complaint." *Banakar v. Krause*, 674 S.W.3d 564, 579 (Tex. App.—Houston [1st Dist.] 2023, no pet.). Such unsupported assertions present nothing for our review. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made,

80

with appropriate citations to authorities and to the record."); *see also Trimcos, LLC v. Compass Bank*, 649 S.W.3d 907, 921 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) ("A failure to provide substantive analysis of an issue or cite appropriate authority waives a complaint on appeal."). We have no duty, or even a right, to conduct an independent review of the record to assess error. *Walker v. Eubanks*, 667 S.W.3d 402, 407–08 (Tex. App.—Houston [1st Dist.] 2022, no pet.) ("We are not responsible for identifying possible trial court error, searching the record for facts favorable to a party's position, or conducting legal research to support a party's contentions."). "Were we to engage in such activities, we would be abandoning our role as judges and become an advocate for that party." *Id*. Accordingly, we conclude Powell waived his sixth issue by inadequately briefing it. *See Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.) ("Failure to cite applicable authority or provide substantive analysis waives an issue on appeal.").

**B.      There Is Legally and Factually Sufficient Evidence to Support the Jury's Verdict and the Sanction of Disbarment.**

Even if Powell had not waived his sixth issue, we would overrule it because there was overwhelming evidence to support both the jury's verdict and the district court's sanction of disbarment.

**1.      Standards of Review.**

Powell makes both legal and factual sufficiency challenges to the verdict and sanction. When a party challenges the *legal* sufficiency of an adverse finding on an

issue for which he did not have the burden of proof at trial, that party must show there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). We will sustain a no-evidence challenge if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Evidence is conclusive only if reasonable people could not differ in their conclusions." *City of Keller*, 168 S.W.3d at 816.

In reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the factfinder's decision and indulge every reasonable inference that supports it. *Id*. at 822. The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony, and it may choose to believe

one witness and disbelieve another. *Id.*at 819. We may not impose our own opinion to the contrary. *Id*. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to the verdict under review." *Id*. at 827.

When a party challenges the *factual* sufficiency of an adverse finding on an issue for which he did not have the burden of proof at trial, we consider all the evidence and set aside the judgment only if the evidence supporting the finding is so weak as to make the judgment clearly wrong and manifestly unjust. *Figueroa v. Davis*, 318 S.W.3d 53, 59 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Again, the factfinder is the sole judge of witnesses' credibility and the weight to give their testimony; we may not impose our own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

### 2. The Jury's Verdict Is Supported by Legally and Factually Sufficient Evidence.

The jury found that Powell violated six of the Texas Rules of Disciplinary Conduct. We conclude there was legally and factually sufficient evidence to support each of those determinations.

### a. The Jury Verdict on Powell's Violation of TEXAS RULE OF DISCIPLINARY CONDUCT 1.02(a)(1).

Texas Rule of Disciplinary Conduct 1.02(a)(1) states, "[a] lawyer shall abide by a client's decisions . . . concerning the objectives and general methods of

representation." TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.02(a)(1), *reprinted in* Tex. Gov't Code, tit. 2, subtit. G, app. A. Powell contends there was legally and factually insufficient evidence to support the jury's finding that he violated this Rule in part because Catherine "effectively terminated Powell on May 14, 2020," and he followed her instructions up to that date and had no duty to follow her instructions after it.

Even if we assume Powell stopped representing Catherine on May 14, 2020, legally and factually sufficient evidence supports the jury's finding on this issue. For instance, the jury saw text exchanges between Powell and Catherine that Powell admitted took place before May 14, 2020. In them, Catherine reiterated her desire to dismiss the appellate proceedings arising out of the Custody Case, to which Powell responded, "I am not dismissing anything." Likewise, the jury saw Catherine's testimony that she began instructing Powell to dismiss the appeals in late 2019. And despite these instructions, Powell continued to vigorously prosecute the appeals.

Based on these and many similar examples in the record, we cannot conclude there was "no evidence" to support the jury's finding on this issue, *Exxon Corp.*, 348 S.W.3d at 215, or that the jury's finding was "clearly wrong and manifestly unjust," *Figueroa*, 318 S.W.3d at 59. Therefore, the jury's finding that Powell violated Rule 1.02(a)(1) is supported by legally and factually sufficient evidence. *See Exxon Corp.*, 348 S.W.3d at 215; *Figueroa*, 318 S.W.3d at 59.

### b. The Jury Verdict on Powell's Violation of Texas Rule of Disciplinary Conduct 1.06(b)(2).

Texas Rule of Disciplinary Conduct 1.06(b)(2) states that, subject to certain exceptions not relevant here, "a lawyer shall not represent a person if the representation of that person . . . reasonably appears to be or become adversely limited by . . . the lawyer's or the law firm's own interests." TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.06(b)(2). Powell contends the jury's finding that he violated this Rule is supported by legally and factually insufficient evidence because no evidence shows that he "ever placed his interests before [Catherine's] until after she made allegations of misconduct, and then, [he] is allowed to defend himself."

We disagree. The record contains many examples of Powell placing his own interests over Catherine's, including maintaining a sexual relationship with her during the representation; filing her confidential health information as a matter of public record; and seeking the appointment of a guardian ad litem for her when she was mired in a custody dispute and seeking employment as a lawyer.

Based on these and many similar examples in the record, we cannot conclude there was "no evidence" to support the jury's finding on this issue, *Exxon Corp.*, 348 S.W.3d at 215, or that the jury's finding was "clearly wrong and manifestly unjust," *Figueroa*, 318 S.W.3d at 59. Therefore, the jury's finding that Powell violated Rule 1.06(b)(2) is supported by legally and factually sufficient evidence. *See Exxon Corp.*, 348 S.W.3d at 215; *Figueroa*, 318 S.W.3d at 59.

### c. The Jury Verdict on Powell's Violation of Texas Rule of Disciplinary Conduct 1.05(b).

Texas Rule of Disciplinary Conduct 1.05(b) states that a lawyer may not "[u]se confidential information of a former client to the disadvantage of the former client after the representation is concluded unless the former client consents after consultation or the confidential information has become generally known," subject to certain exceptions, including "[t]o the extent reasonably necessary to enforce a claim or establish a defense on behalf of the lawyer in a controversy between the lawyer and the client." TEXAS RULE OF DISCIPLINARY CONDUCT R. 1.05(b)(3), (c)(5). The jury found that Powell violated this Rule, and that his conduct was not subject to any of the exceptions that would have allowed him to disclose Catherine's confidential information. Powell claims there is legally and factually insufficient evidence to support these findings because his "disclosure of any alleged confidential information during the [Custody Case], to defend himself, was excused. . . . [Catherine] effectively terminated Powell on May 14, 2020 . . . when she made allegations of professional misconduct that resulted in five days of testimony. Thus, Powell was entitled to that exception to the disciplinary rules to defend himself and his law firm from [Catherine's] allegations."

The "five days of testimony" to which Powell refers was the hearing on the motion to show authority. But the jury heard evidence, among other things, that Powell and his firm "filed [Catherine's] confidential cell phone records, mental

86

health records, and other medical records and sensitive information" with the district court hearing the Custody Case. The jury reasonably could have concluded that none of this confidential information was necessary to respond to the motion to show authority, and thus did not fall into the exception allowing for the disclosure of a former client's confidential information "to the extent reasonably necessary" to defend against allegations of misconduct. *See* TEXAS RULE OF DISCIPLINARY CONDUCT R. 1.05(c)(5).

Based on these and many similar examples in the record, we cannot conclude there was "no evidence" to support the jury's finding on this issue, *Exxon Corp.*, 348 S.W.3d at 215, or that the jury's finding was "clearly wrong and manifestly unjust," *Figueroa*, 318 S.W.3d at 59. Therefore, the jury's finding that Powell violated Rule 1.05(b) is supported by legally and factually sufficient evidence. *See Exxon Corp.*, 348 S.W.3d at 215; *Figueroa*, 318 S.W.3d at 59.

### d. The Jury Verdict on Powell's Violation of Texas Rules of Disciplinary Conduct 3.01 and 3.02.

Texas Rule of Disciplinary Conduct 3.01 states, "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous." TEXAS RULE OF DISCIPLINARY CONDUCT R. 3.01. Texas Rule of Disciplinary Conduct 3.02 states, "[i]n the course of litigation, a lawyer shall not take a position that unreasonably increases the costs or other burdens of the case or that unreasonably

delays resolution of the matter." TEXAS RULE OF DISCIPLINARY CONDUCT R. 3.02. The jury found Powell violated both Rules. Powell argues these findings are not supported by legally or factually sufficient evidence because the "allegations of frivolous pleadings in this proceeding were all in the context of standing," and his arguments about the Fletchers' lack of standing were nonfrivolous.

Even assuming Powell is correct that his standing arguments were nonfrivolous, the jury heard evidence about several filings Powell made and positions he took that addressed issues other than standing. A reasonable jury could conclude that many of them, alone or together, were baseless or intended to needlessly increase litigation costs—particularly after Powell told opposing counsel that he would drive up the costs of the litigation if they did not agree to his demand to renegotiate the terms of the MSA to which Catherine had agreed. For example, the jury heard testimony that the day after that initial meeting, Powell moved to set aside the MSA based on allegations of family violence that Catherine had disclaimed under oath. And it heard testimony that Powell moved to recuse the judge from the Custody Case based on just a clerical error, in which Powell accused the judge of "ethical and legal violations." The jury reasonably could have found these filings to be frivolous and made to carry out Powell's threat to increase the burdens of litigation for not renegotiating the MSA.

Based on these and many other examples in the record, we cannot conclude there was "no evidence" to support the jury's finding on this issue, *Exxon Corp.*, 348 S.W.3d at 215, or that the jury's finding was "clearly wrong and manifestly unjust," *Figueroa*, 318 S.W.3d at 59. Thus, the jury's finding that Powell violated Rules 3.01 and 3.02 is supported by legally and factually sufficient evidence. *See Exxon Corp.*, 348 S.W.3d at 215; *Figueroa*, 318 S.W.3d at 59.

> **e.    The Jury Verdict on Powell's Violation of Texas Rule of Disciplinary Conduct 1.15(d).**

Texas Rule of Disciplinary Procedure 1.15(d) states, "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client is entitled." TEXAS RULE OF DISCIPLINARY CONDUCT R. 1.15(d). Powell contends the jury's finding that he violated this Rule is not supported by legally or factually sufficient evidence because he "was never provided a signed request to turn over [Catherine's] file," and in any event he "turned over the pleading binders in hard copy" but did not provide Catherine's new counsel with the complete file because he had to "redact the file to protect the interest of third parties and clients."

Despite these assertions, the jury heard testimony that after new counsel appeared in the Custody Case, she sent two letters to Powell requesting Catherine's file. The first "request[ed] a copy of [Catherine's] file," including "all correspondence with the client by text, email or otherwise." The second directed that

Catherine's file "shall be provided to her, through me as her new counsel, in its complete form," including "any communication that you deem to be attorney-client privilege, as the privilege is hers to assert or waive as the client, and not yours." And the jury heard testimony that while Powell provided copies of Catherine's medical records, he did not provide letters, emails, pleadings, discovery, or original documents. Therefore, the jury reasonably could have found that Powell failed to turn over Catherine's complete file in violation of Rule 1.15(d).

Based on these and many other examples in the record, we cannot conclude there was "no evidence" to support the jury's finding on this issue, *Exxon Corp.*, 348 S.W.3d at 215, or that the jury's finding was "clearly wrong and manifestly unjust," *Figueroa*, 318 S.W.3d at 59. Therefore, the jury's finding that Powell violated Rule 1.15(d) is supported by legally and factually sufficient evidence. *See Exxon Corp.*, 348 S.W.3d at 215; *Figueroa*, 318 S.W.3d at 59.

### 3. The District Court Did Not Abuse Its Discretion by Imposing a Sanction of Disbarment.

Besides challenging the jury's verdict, Powell also contends the district court's sanction of disbarment was not supported by legally or factually sufficient evidence. He appears to argue that in imposing its sanction, the trial court failed to follow the analytical framework required by the Texas Rules of Disciplinary Procedure because it (1) improperly considered aggravating factors that weighed for disbarment while ignoring mitigating factors that weighed against it, and (2)

misapplied the criteria for determining when disbarment is appropriate. Powell cites no authorities in support of this argument.

> **a.  Standards Applicable to the District Court's Imposition of Sanctions.**

After a jury has determined that a lawyer committed professional misconduct, the trial judge determines the sanction. TEXAS RULES OF DISCIPLINARY P. R. 3.09 ("If the court finds that the Respondent's conduct does constitute Professional Misconduct, the court shall determine the appropriate Sanction or Sanctions to be imposed."). The trial judge has discretion to hold an evidentiary hearing on the sanction to be imposed. *See* TEXAS RULES OF DISCIPLINARY P. R. 15.03 ("In any . . . Disciplinary Action where Professional Misconduct is found to have occurred, the . . . district court may, in its discretion, conduct a separate hearing and receive evidence as to the appropriate Sanctions to be imposed.").

The trial judge's determination of the appropriate sanction is now guided by Part XV of the Texas Rules of Disciplinary Procedure, entitled "Guidelines for Imposing Sanctions" ("Guidelines"). *See* Texas Supreme Court Corrected Order Giving Final Approval of Amendments to the Texas Rules of Disciplinary Procedure, Misc. Docket No. 18-9112 (Tex. Aug. 28, 2018) (replacing mandatory factors for imposing sanctions under former Rule 3.10 with Part XV, and making Part XV applicable to disciplinary cases initiated by grievances filed after June 1, 2018).

The Guidelines are intended to give trial courts flexibility in imposing sanctions. They "set forth a comprehensive system for determining sanctions, permitting flexibility and creativity in assigning Sanctions in particular cases of lawyer misconduct." TEXAS RULES DISCIPLINARY P. R. 15.01.B. They "do not limit the authority of a . . . district judge to make a finding or issue a decision." *Id*. Instead, the Guidelines set out four "general factors" a trial court "should consider" when imposing sanctions: "(a) the duty violated; (b) the Respondent's level of culpability; (c) the potential or actual injury caused by the Respondent's misconduct; and (d) the existence of aggravating or mitigating factors." TEXAS RULES DISCIPLINARY P. R. 15.02.

The Guidelines next establish five categories of lawyer misconduct— violations of (1) duties owed to clients (Rule 15.04), (2) duties owed to the legal system (Rule 15.05), (3) duties owed to the public (Rule 15.06), (4) other duties as a professional (Rule 15.07), and (5) prior disciplinary orders (Rule 15.08)—and then describe the ranges of sanctions that are "generally appropriate" for each category of misconduct, depending on the particular circumstances of the case. TEXAS RULES DISCIPLINARY P. R. 15.04–.08. For example, the Guidelines say that when an attorney engages in a pattern of failing to "abide by client decisions and causes serious or potentially serious injury to a client," disbarment is "generally appropriate." TEXAS RULES DISCIPLINARY P. R. 15.04.A.1(c).

Finally, the Guidelines give trial courts discretion to consider aggravating or mitigating factors. *See* TEXAS RULES DISCIPLINARY P. R. 15.09.A ("After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose."). They then list the various factors that trial courts may consider as aggravating, mitigating, and neither aggravating nor mitigating. TEXAS RULES DISCIPLINARY P. R. 15.09.B–.D. But the Guidelines do not require that trial courts consider or disregard any factor. Sanctions can include disbarment, resignation in lieu of disbarment, suspension, public reprimand, or private reprimand. *See id*. TEXAS RULES DISCIPLINARY P. R. 1.06(FF).

In line with the Guidelines' approach of allowing "flexibility and creativity" in determining an appropriate sanction, TEXAS RULES DISCIPLINARY P. R. 15.01.B, trial courts have "broad discretion to determine whether an attorney guilty of professional misconduct should be reprimanded, suspended, or disbarred." *State Bar of Tex. v. Kilpatrick*, 874 S.W.2d 656, 659 (Tex. 1994). But "[t]he judgment of a trial court in a disciplinary proceeding may be so light, or so heavy, as to constitute an abuse of discretion." *Id.*

We review the trial court's sanction determination for abuse of discretion. *Love v. State Bar of Tex.*, 982 S.W.2d 939, 944 (Tex. App.—Houston [1st Dist.] 1998) ("A trial court has broad discretion to determine the consequences of professional misconduct. . . . We will only reverse the trial court's decision if an

abuse of discretion is shown."). Generally, a trial court abuses its discretion if it acts in an unreasonable or arbitrary manner or without reference to any guiding rules and principles. *Downer*, 701 S.W.2d at 241. "The mere fact that a trial court may decide a matter differently than an appellate court does not demonstrate an abuse of discretion." *Cantu v. Comm'n for Law. Discipline*, No. 13-16-00332-CV, 2020 WL 7064806, at *20 (Tex. App.—Corpus Christi Dec. 3, 2020, no pet.) (mem. op.).

### b. The District Court Did Not Abuse Its Discretion in Imposing a Sanction of Disbarment.

After the jury determined that Powell committed professional misconduct, the district court held a separate sanctions hearing at which it received more evidence. *See* TEX. RULES DISCIPLINARY P. R. 15.09. Shortly after the hearing, the trial court sent a letter to the parties stating that she had "reviewed the testimony, exhibits, and the case law"; done a "careful review of the jury's finding and the existence of aggravating or mitigating factors"; and determined that "[d]isbarment is the appropriate sanction in this matter." The district court later entered its Judgment of Disbarment, in which it disbarred Powell based on "consideration of the guidelines for imposing sanctions set forth in the Texas Disciplinary Rules of Procedure."

At Powell's request, the district court issued findings of fact and conclusions of law. In them, the district court stated that its findings are "based on the findings of the jury and the testimony presented at the sanctions hearing." It then set out the factual findings supporting its sanctions decision, such as findings that Powell's

conduct "caused serious or potentially serious injury to his client" and "was to his benefit only." The district court's legal conclusions were reached "[p]ursuant to the [Guidelines] . . . and after considering all aggravating and mitigating circumstances," ultimately concluding that "disbarment is the appropriate sanction in this cause."

We conclude the district court did not abuse its discretion in imposing a sanction of disbarment. The same evidence that supports the jury's findings supports disbarment. For example, the district court heard evidence and found that: Powell failed to abide by Catherine's decisions about the objectives and general methods of representation, causing her serious or potentially serious injury; Powell's filing of Catherine's confidential information caused her injury or potential injury; and Powell abused the legal process by "knowingly filing pleadings consistently that had already been ruled on," thus "causing increased costs to all parties and a delay in a final decision." The district court was within its discretion in concluding that these and its other findings warranted a sanction of disbarment.

Powell contends otherwise based on his claim that the district court did not properly consider the factors applicable to the various categories of misconduct as established by Texas Rules of Disciplinary Procedure 15.04–.08. Powell points first to Rule 15.04.A.1, which applies to "cases involving . . . failure to abide by client decisions." TEXAS RULES DISCIPLINARY P. R. 15.04.A.1. It states that disbarment is

"generally appropriate" when "a Respondent engages in a pattern of . . . failure to abide by client decisions and causes serious or potentially serious injury to a client." TEX. RULES DISCIPLINARY P. R. 15.04.A.(a). Powell argues that under this Rule disbarment was inappropriate because "there was no evidence submitted or even argument to suggest [he] caused seriously [sic] or potentially serious injury to a client" since the Commission did not "alleg[e] that Powell caused [Catherine] to take her own life." But even assuming that statement to be true, there are other forms of injury, and the district court specifically found that Powell's failure to abide by Catherine's decisions caused her injury "because the actions did not further the goal of his client." And for the reasons set forth above (among others), the record contains ample evidence to support that finding, including evidence that certain of Powell's continued filings after Catherine instructed him to dismiss her case were "clearly calculated to embarrass [Catherine], make her search for employment more difficult[,] and harm her custody litigation."

Powell turns next to Rule 15.04.D, which guides sanctions determinations in cases involving conflicts of interest. *See* TEXAS RULES DISCIPLINARY P. R. 15.04.D. Rule 15.04.D.1 states that in such cases, disbarment is "generally appropriate" when the respondent attorney, without the client's consent, "engages in representation of a client knowing that the Respondent's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious

96

injury to the client." TEX. RULES DISCIPLINARY P. R. 15.04.D.1(a). Powell claims, without further elaboration or support, that "there is no evidence that such circumstances existed." But the district court expressly found that Powell's conflict "in regard to pursuing the appeal of his sanctionable conduct while refusing to dismiss his client's appeal as requested, was to his benefit only and potentially caused serious injury to his client." For the reasons stated above, the record also contains evidence to support this finding, including evidence that Powell "used threats, intimidation, and the disparity of power between [him and Catherine] to force [Catherine] to falsely assert that [Powell and his firm] had authority when he did not."

Powell next cites Rule 15.05.B, which guides sanctions decisions in cases involving a "failure to bring a meritorious claim" and "failure to minimize the burdens and delays of litigation." TEXAS RULES DISCIPLINARY P. R. 15.05.B. This Rule states that disbarment is "generally appropriate" where the respondent attorney "knowingly engages in an abuse of the legal process with the intent to obtain a benefit for the Respondent or another, and causes serious injury or potentially serious injury to a client or other party or causes serious or potentially serious interference with a legal proceeding." TEX. RULES DISCIPLINARY P. R. 15.05.B.1. Powell argues disbarment was inappropriate under this Rule because "there was no evidence whatsoever that [he] benefited in any way, or that he abused the legal

97

process," since "[t]he lack of standing and allegations of family violence . . . were valid reasons for [Catherine] to attempt (through Powell as counsel) to seek to set aside the MSA."

Even assuming those statements to be true (and for the reasons explained above, they are not), the record contains evidence that Powell often advanced frivolous positions for his own benefit, in situations other than those dealing with the issues of standing and family violence. For example, Powell sought recusal of the judge presiding in the Custody Case due to a clerical error, which needlessly prolonged the litigation and increased its burdens even after Catherine had repeatedly requested that it be dismissed. Therefore, the district court's finding that Powell asserted frivolous positions and increased the costs and burdens of litigation is supported by sufficient evidence, and the district court did not abuse its discretion in determining that disbarment was the appropriate sanction.

Powell also relies on Rule 15.04.B, which guides sanctions determinations in cases "involving the failure to preserve client property, including the failure to surrender papers and property." TEXAS RULES DISCIPLINARY P. R. 15.04.B. This Rule states that disbarment is "generally appropriate" when a respondent attorney "knowingly converts client property and causes injury or potential injury to a client." TEX. RULES DISCIPLINARY P. R. 15.04.B.1. Powell claims disbarment is unwarranted under this Rule because there is "no evidence that he 'knowingly' converted client

property, or that he caused injury or potential injury to a client by such conversion." But the record contains evidence that Powell failed to surrender Catherine's file to her new counsel in "bad faith because it was obvious during the hearing [on the motion to show authority] that [Powell and his firm] intended to use [Catherine's] file against her while at the same time declining to timely fulfill their duty to comply with her request for her file." This evidence supports a finding that Powell "knowingly" failed to surrender Catherine's file, and that it caused Catherine injury. Accordingly, the district court did not abuse its discretion in determining that disbarment was warranted.

Finally, Powell argues that disbarment is an inappropriate sanction for his disclosures of Catherine's confidential information. But the district court did not conclude that disbarment was warranted for this violation; it concluded suspension would be the appropriate sanction. Therefore, Powell's arguments on this point are misplaced.

For each of these reasons, we conclude the district court did not abuse its discretion in entering a judgment of disbarment. We overrule Powell's sixth issue.

## VII. The District Court Did Not Abuse Its Discretion in Ruling on Powell's Formal Bill of Exceptions.

In his final issue, Powell contends the district court abused its discretion by excluding certain evidence from his bill of exceptions. But Powell failed to follow

the proper procedures for submitting a bill of exceptions, and thus the district court's ruling on his bill was correct. *See* TEX. R. APP. P. 38.1(i).

A bill of exceptions is a means of preserving error. *See* TEX. R. APP. P. 33.2. Powell attempts to use the bill of exceptions to preserve alleged error in the trial court's exclusion of evidence. "To preserve the error of a trial judge in excluding evidence, a party must: (1) attempt during the evidentiary portion of the trial to introduce the evidence; (2) if an objection is lodged, specify the purpose for which it is offered and give the trial judge reasons why the evidence is admissible; (3) obtain a ruling from the court; and (4) if the judge rules the evidence inadmissible, make a record, either by offer o[f] proof or through a formal bill of exceptions, of the precise evidence the party desires admitted." *In re J.O.*, No. 04-07-00752-CV, 2008 WL 2037404, at *2 (Tex. App.—San Antonio May 14, 2008, no pet.) (mem. op.).

A bill of exceptions thus can insert otherwise excluded evidence into the record. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006) ("The purpose of a bill of exceptions is to allow a party to make a record for appellate review of matters that do not otherwise appear in the record."). And the reason for adding the excluded evidence into the record is to allow an appellate court to determine whether the trial court was correct in excluding it. *In re Estate of Ulrich*, No. 04-12-00514-CV, 2014 WL 129599, at *9 n.3 (Tex. App.—San Antonio Jan. 15, 2014) (mem.

100

op.) ("The primary purpose of a bill of exception is to include excluded evidence in the record so that an appellate court can determine whether the trial court *erred in excluding it*." (emphasis in original)). Therefore, for an item of evidence to be properly included in a bill of exceptions, it first must have been offered and excluded at trial. *See* TEX. R. APP. P. 33.2; *In re J.O.*, 2008 WL 2037404, at *2.

Powell's complaint on appeal appears to be that the district court failed to include various items of evidence in his bill of exceptions. But his brief fails to identify those items of evidence that (1) were offered and excluded at trial, *and* (2) the district court refused to include in the bill. Instead, the section of Powell's brief that addresses his bill of exceptions refers to another part of the brief discussing "the proposed evidence." That other part of the brief then lists several exhibits Powell claims were improperly excluded from the bill. But the trial court either agreed those exhibits should appear in the record, or it declined to include them in the bill because they were not first offered and excluded at trial. *See In re Estate of Miller*, 243 S.W.3d 831, 837 (Tex. App.—Dallas, no pet.) (preservation of error in exclusion of evidence requires its proponent to "present to the trial court a timely request, motion, or objection, state the specific grounds therefore, and obtain a ruling that appears in the record")

We use the first three exhibits listed in Powell's brief as examples, which are exhibits "FP 1, 4, [and] 8." In its review of Powell's bill, the district court determined

101

that: (1) FP 1 was "admitted into evidence and should be included in the record"; (2) FP 4 was "not offered at trial and the [district] court did not refuse to admit [it]"; and (3) FP 8 was "offered into evidence and excluded by the court and should be included in the record for the appellate court's review." Because the district court either agreed with Powell that these items should appear in the record (FP 1 and 8) or refused to include them because they do not satisfy the prerequisite of having first been offered and excluded at trial (FP 4), Powell's argument is unclear.

To the extent Powell claims the district court erred by excluding from his bill items of evidence that were not offered and excluded from trial, we disagree. A trial court does not abuse its discretion by refusing to include in a bill of exceptions evidence that was not offered and excluded at trial. *See* TEX. R. APP. P. 33.2; *In re J.O.*, 2008 WL 2037404, at \*2. And because Powell has failed to identify in his brief any evidence that was offered and excluded and then denied inclusion in his bill, Powell has waived those arguments due to inadequate briefing. *See* TEX. R. APP. P. 38.1(i).

Nor did Powell meet the content requirements for a bill of exceptions as stated in Texas Rule of Appellate Procedure 33.2. Under that Rule, "[a] formal bill of exception must be presented to the trial court for its approval, and, if the parties agree to the contents of the [proposed] bill, the trial court must sign the bill and file it with the trial court clerk." *In re Marriage of Rangel & Tovias-Rangel*, 580 S.W.3d 675,

680 n.3 (Tex. App.—Houston [14th Dist.] 2019, no pet.). But if, as here, the parties do not agree on the contents of the bill, Rule 33.2 requires the trial judge to "suggest to the complaining party those corrections to the bill that the judge believes are necessary to make it accurately reflect the proceedings in the trial court." TEX. R. APP. P. 33.2(c)(2)(B). Then, "if the complaining party will not agree to the corrections suggested by the judge, [the trial judge must] return the bill to the complaining party . . . and file with the trial court clerk such bill as will, in the judge's opinion, accurately reflect the proceedings in the trial court." TEX. R. APP. P. 33.2(c)(2)(C). The district court met these requirements.

At that point, Powell had the option to "file with the trial court clerk the bill that was rejected by the judge." TEX. R. APP. P. 33.2(c)(3). But in doing so Powell also had to "file the affidavits of at least three people who observed the matter to which the bill of exception is addressed. The affidavits must attest to the correctness of the bill as presented by the party." *Id*. The record does not reflect that Powell filed the required affidavits in support of his bill. His bill of exceptions fails for this reason as well.

We overrule Powell's seventh issue.

## Conclusion

We affirm the trial court's judgment of disbarment. All pending motions are denied.

## PER CURIAM

Panel consists of Justices Goodman, Landau, and Countiss.